JOHN J. COCKE *v.* A. B. HANNUM and LOUISA his wife.

1. PARENT AND CHILD : RIGHT OF FATHER TO THE CUSTODY OF HIS CHILD.—By the common law the father, as against the mother, is entitled to the custody of his infant child, unless the child be so young as to render the care and attention of the mother necessary to its nurture, or unless it be shown that the father is of such character, or is in such circumstances, as to render it prejudicial to the health, comfort, or morals of the child that it should be in his keeping.

2. SAME : RIGHT OF CHILD TO ELECT ITS CUSTODIAN : HABEAS CORPUS.— If the claim of the parent to the custody of his child be asserted by *habeas corpus*, and the child be of sufficient age to judge for itself and make a rational choice as to where it will go, the child's choice will be respected.

3. SAME : POWER OF COURT TO DISPOSE OF CHILD WHERE PARENTS ARE DIVORCED UNDER THE STATUTE OF THIS STATE.—Art. 17, p. 334, of the Rev. Code, which gives the Chancery Court the power, in making a decree

for a " divorce," in its discretion to make all orders touching the care, custody, and maintenance of the children, * * * having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just," annuls the paramount right of the father, as it exists at common law, to the custody of his child, where the parents are divorced, and vests the power of disposing of the child in the court. And if the court, in pronouncing the divorce, fail to make any order in respect to the custody of a child, the fruit of the marriage, any other court before which the right to its custody may be litigated may regard the mere legal right of the father as at an end, and make such disposition of the child as may appear to be equitable and just.

4. SAME : FATHER FORFEITS HIS RIGHT TO CHILD WHEN DIVORCE CAUSED BY HIS ADULTERY.—If the adultery of the father be the cause· of the divorce, the care and custody of the children ought to be committed to the mother, if she be not shown unfit for that duty.

5. SAME : FATHER'S RIGHT FORFEITED BY INTEMPERANCE AND OBSCENITY. —Proof that the father had been twice divorced for adultery, that he is addicted to intemperance to such an excess as to be guilty of the grossest vulgarity and obscenity in actions and language in the presence of others, both male and female, is sufficient to deprive him of the care and custody of a female child of three years of age, in favor of the mother, against whom no objection exists on the ground of morals.

ERROR to the judgment of Hon. John Watts, on writ of *habeas corpus.*

*W. P. Harris,* for plaintiff in error.

The legal question presented by the record in this cause must be examined by the light of the decisions of the courts of *common law*, and not by that of decisions in *courts of equity*, acting on their claim to jurisdiction over infants as representing the *parens patriæ.* Even courts of equity disclaim any power to deal with the persons of infants or to control their custody, except where they are wards of court or owners of property. The only ground on which courts of equity could assume jurisdiction here would be that the infant was not an *orphan* and yet owned property, and then only on the ground that the jurisdiction of the Court of Probates in such case to appoint guardians was conferred by *statute* only, which did not necessarily affect the jurisdiction in equity. It will be found that courts of equity have exercised a very liberal discretion on this subject in England, but at the same time it has been admitted that their jurisdiction could only

attach on account of the ownership of property by the minor. See *Wellesley* v. *Duke of Beaufort*, cited by Talfourd, J., *In re Hakeman*, 74 Eng. C. L. R. 222.

Courts of equity consult the general interests of the minor, and do not consider themselves as fettered by the legal rights of the father. They accordingly consult the interests of the child, *pecuniary*, social, and moral.

Courts of law, on the other hand, have felt bound to respect the legal right of the father, allowing that legal right to prevail in every case unless the child is of such tender years as to require the attention of a mother, or the father is disqualified for the custody of the child, or the child old enough to decide for itself.

Our position in this cause is, that there must be and is a definite rule to determine these exceptions, and while the existence of these exceptions to the father's right shows that the interest of the child is paramount to the naked legal right of the father, yet they do not furnish ground for the doctrine that a court of law may consult the general pecuniary and social interests of the child, the father being fit or rather not disqualified, and the child old enough to be separated from the mother; that although the action of the courts of law has been limited by the nature of the remedy by *habeas corpus*, and to some extent controlled by the exigencies of the writ, which in form is in favor of the infant, yet, where the physical necessities of the infant do not demand the mother's care, and the father is not positively disqualified, and the child too young to be allowed to go at large and choose a custody, those courts have regarded the remedy, and it is now regarded, as a remedy by the father to obtain a right which is, within these limits, paramount to all considerations of general, social, or pecuniary advantage of the child. *Rex* v. *Delaval*, 3 Burr. 1434. That is to say, where the child is too young to be left to its own choice, and old enough to be separated from the mother without danger to its physical health, the father's paramount right will prevail, unless he is shown to be positively unfit to have the custody of the child by reason of insanity, inability to maintain it, or his habits such as to certainly endanger the morals or safety of the child. If, in the case mentioned—the

child old enough to be parted from the mother without danger to its health and too young to be left to choose for itself—the father is a fit person, (and by this we mean, not totally disqualified,) his right must prevail without regard to any other consideration. Courts of law have not and cannot enter into the question as to the relative fitness of the parties claiming the custody of the child—the superior amiability of the one over the other, the superior social position of one over the other, nor the question of money or property advantages possessed by one over the other—the capacity of the father to support the child being conceded.

There cannot be a tyranny more grievous than that which would be wrought by judges, if allowed to determine the proper custody of a child by running a parallel between the merits of contending parties. It is quite enough to concede that the legal right of the father shall not prevail to the destruction of the child's health and morals; but, to allow the legal right of the father to be controlled by considering the relative fitness of others, is to give a range to judicial discretion to which no community is prepared to submit. If the child is of very tender years, so as to demand the mother's care, the courts, considering that the interest of the child "strongly requiring it," to use the language of Kent, refuse to allow the father's right to prevail. This is the utmost extent to which they can go, unless the father is disqualified to have the custody of his child. This is the extent to which sound authority goes, and it prescribes a rule which is capable of being definitely understood and applied. But, if we step beyond the *necessities* of the child and the *positive unfitness* of the father, there is no rule at all.

I repeat, that if the child can be separated from the mother without danger to its health, and is not old enough to be allowed a choice of custody, the father, not being shown to be clearly and positively unfit, is entitled to have the custody of his child, as a matter of plain legal right; and to hold the contrary, and to allow the courts to compare the strength of the mother's love, as set forth by the *poets*, with that of the father's, and make that, or the mere superiority of the mother in respect to money or social position or other worldly advantages, the rule of decision, is

to say that law does not govern this most important right of the father.

"The court will feel bound to restore the custody—where the law has placed it—with the father, unless in a clear and strong case of unfitness on his part to have such custody." *Commonwealth* v. *Briggs*, 16 Pick. 205.

The rule thus laid down results from considerations which are of a controlling nature in any judicial question. If law is the rule to guide the court in a judicial question, we have stated it. If the *emotions* are to guide the court, then no question of law can arise or apply to the case.

These considerations are, that the *habeas corpus*, as applicable to a child too young to choose a custody and yet old enough to be separated from the mother without danger to the child, is in substance and effect a remedy to recover the possession of a child by the person entitled to have it. The father of a legitimate child is so entitled *prima facie* against all the world. The mother has no legal claim on a legitimate child, the father being alive. No court of law has ventured to modify the father's right with respect to any *right* of the mother. The right of the child to *health* and protection from moral contamination has been allowed to modify the father's legal title, but the mother's claim never.

I repeat the language of Talfourd, J., *In re Hakeman*, 74 Eng. C. L. R. 222: "There is not a *scintilla* of authority" that the father's right is ever subject to modification on the idea that the mother has an equal or superior right. The Code, p. 459, has in a pointed manner recognized the power and right of the father as paramount. The father has a property in the services of his children distinctly recognized by law, and is responsible for their support. So far as God's law and man's law go—so far as the usages and assent of mankind are concerned—there is no right which is so universally recognized. There is no code of law or morals, unless we except the code of morals inaugurated by the woman's rights and free love associations, in which this right of the family head is not recognized as the basis of civil government itself. This headship, with its responsibilities and powers, is set forth in the Scriptures in a peculiar manner. There is no

other remedy known by which the *father* can get possession of his child, though he might recover damages.

When, therefore, the father seeks to vindicate his right in this form, is it to be determined by the peculiar views of the judge as to the manner in which children should be raised and educated, or by considerations relating to mere social *advantages* of one custody over the other; or is he to determine it, as in case of any other admitted right, by ascertaining whether the father has forfeited his right by rendering himself unfit to have the custody of his child?

The mother has no claim which a court can recognize as against the father. The court would be bound to yield as much to the claim of any other person to the custody, as against the father. A man of superior piety and higher social position, and offering to give the child a superior education, or to settle property on it, might take away the child of any poor man who has not these advantages, and there is no remedy, if the father suffers by comparison with a perfect standard of morality and sobriety. The rule laid down by the English courts is consistent and founded on principle. The mother has no right, as against a father; a stranger would have as good a right in law. The interest of the child is consulted so far as to see that its health and morals are not placed in certain peril, but no further. If we enter into the considerations of general advantages of one custody over another, we abandon a sacred right to caprice of judges; subject it to invasion from any quarter.

The idea is held out in some of the American cases (*People* v. *Mercein,* by some of the judges, and elsewhere perhaps) that the English rule was so cruel and irreconcilable as to excite the indignation of the judges, and provoke the intervention of parliament; and that consequently American courts, deriving the remedy and its doctrines from the common law, were warranted in overturning it without waiting for legislation.

Lord Alvenlay said he was ashamed of the English law which allowed a man to bequeath all his property to strangers and leave his children on the parish. I do not think that any English judge, however, has felt authorized to alter the law. But the English cases and the English doctrine have been misconceived.

Good sense and sound principle pervade their decisions on the subject. The case of *Rex* v. *Greenbill*, 31 Eng. C. L. R. 153, is the case which is said to have given offence to the nicer moral sense of certain of the American courts. That was a case where children were forcibly taken from the husband by the wife's friends. The youngest was two years and a half old. The husband lived in adultery with a Mrs. Graham, but the woman was not kept in his house, and the children not brought in contact with her. Lord Denman said, the right of the father will not be allowed to prevail where " the enforcement of it would be attended with danger to the child, or where there is apprehension of cruelty or of contamination by some exhibition of gross profligacy," (p. 159,) " though an illicit connection is shown," &c., &c., " yet it is not pretended that Mrs. Graham is keeping the house to which the children are to be brought." The English courts therefore have held that a father does not forfeit his right by mere incontinence. It is ridiculous to contend that the courts can inflict a forfeiture of any important right, where the law of the land attaches no such consequence to it. If, in the case cited, the children were likely to be placed with a lewd woman, the court would have decided otherwise, as is intimated.

The English statute so much harped on was passed for the benefit of wives who were compelled to submit to insult and cruelty, rather than submit to the loss of children; and provided for a proceeding by the wife to have the custody of children under a certain age when her husband's conduct compelled her to leave him. The English rule in the common law courts remains untouched, and the courts there have continued to enforce the established doctrine, as in *In re Hakeman* before cited.

The husband's right must prevail, unless he has forfeited it by rendering himself unfit to have the custody of his children; and this matter of disqualification or unfitness is to be determined without reference to speculative advantages to the child. Moreover it is to be determined by a practical standard, not by comparison with perfect models. If intoxication is relied on, it must be so habitual and excessive in degree as to impair the judgment and capacity to govern discreetly and provide support. A spree two or three times in the course of the year, and lasting but a day or

two, and the remainder of the time marked by kindness, gentlemanly conduct, industry, and successful business habits, cannot be set down as disqualifying any man to rule a household. If the general tenor of the life we examine is good—if its chief energies and the bulk of its time are employed in the right direction—it comes up to the practical standard, although it may be blemished by occasional shortcomings.

The sprees of the petitioner lasted a day, and suppose they occurred four or five times in twelve months, and all the balance of his time was spent in business successfully, exhibiting kindness, delicacy, integrity, and honor, can it be said that he is unfit for the business and the duties of life?

The child is over three years of age and healthy. It cannot be pretended that a separation from the mother would endanger its health, and it would be a gross perversion of evidence to say that there is danger of moral contamination at the house of the father.

If it is considered proper to run a parallel between petitioner and the defendant, here stands the summary : the father is shown to be a man of integrity, a gentleman of most respectable family, married to an amiable, chaste, and respectable wife, living in a comfortable house, a physician with a large and lucrative practice in a neighborhood where there are other physicians. He maintains this practice against competition, preserves the confidence of his patrons—people of the highest standing. It is impossible that his drinking can be habitual or carried to any great excess under these circumstances. Accordingly it is shown that he is not a habitual drunkard, but occasionally gets drunk and remains so for a day, and at such times is boisterous, obscene, and vulgar, never cruel to children. He is kind-hearted, and every way a good husband, save this one blemish. See the testimony of defendant herself, p. 40–42, Record. He now sustains the relations of husband and father in respectable standing. The only testimony that he ever struck his wife, the defendant, is from her statement made in connection with, and as an excuse for, her assault upon his life with a *hatchet;* she saying that if *she had not attempted his life* she would be content to live with him, a kind, honorable, and good husband, except in the occasional sprees.

She on the other hand is shown to be a violent and dangerous woman, using bowie-knife, hatchet, and pistol. She fractured his skull with a hatchet, attempted to stab him with a bowie-knife, and goes armed with revolvers during her marriage with Hannum. Her *motherly* regard for her *children* not restraining her lewdness, she prostituted herself whilst a mother. She is now the wife of a vagabond, and no longer in *sui juris*. What avails affection (which a brute feels for offspring) if a mother can so far forget her higher obligations, and blast the reputation of her children, by indulging her lewd passions.

The laws of society do not exclude the child of guilt, provided it is brought up and nurtured by persons who are chaste; but a female child brought up by a strumpet cannot enter society. We can well understand the solicitude of a father and his kindred in this case.

*D. D. Porter*, on same side,
Filed an elaborate argument.

*J. F. Foute*, on same side.

*George L. Potter* and *Fulton Anderson*, for defendants in error.

The proof is in the mind of the court, and need not be detailed. It shows that defendant is *now*, and for years past has been, irreproachable in conduct. A prudent, devoted, and capable mother, she has recently given up a husband, to cleave to and devote her life to her children. Her associations are good, and she affords to her children the advantages of the best society of the town in which she dwells. She has a handsome property; her eldest daughter is already provided for, as heiress of her father; and she is thus left free to devote her means for the welfare of the infant in controversy.

What advantages can petitioner offer? It is said he has another wife and a home, and we offer nothing against that wife. Suffice it to say that she married Cocke in a brief time after his public divorce for adultery, in the same county and in the same vicinage where he committed the transgression; married him after her father had been a witness to the midnight

orgies of Cocke, and after he had told his son (the overseer) to quit and go home—that the house of Cocke "was no proper place for him." It is proved that Cocke still becomes drunken, and is then gross and obscene in acts and words; he curses defendant in hearing of her son and of his present wife. It is not pretended that he has conquered or ceased to indulge his lusts, nor do zealous counsel venture to hope he ever will. The proof does not show who now visits his house, nor what advantages he can offer his child; it is proven that some of his nearest neighbors hold no intercourse with him. The transcript from the records shows unsatisfied judgments against him; and none can suggest what property he has, save his homestead, which is exempt from execution. It is said they might have shown these judgments were in part paid—*if they had time;* but our transcript is enclosed as filed in this cause *some six months ago;* it was filed with the answer.

The past is proof that Cocke can offer no advantages of training, or property, or society to this child; he has never manifested the affection of a father to it, and we must suppose his affections, if any, will cluster around the children of his present wife. This little one would be indeed an orphan in his home, even if the *stepmother* sought to comfort her.

The petitioner can offer no advantages—nothing for the good of the child. Need we pause to suggest the evils to which it would be exposed? Suffice it to say, her father has been twice divorced for adultery; is proved to be unmanly and cruel; a wife-whipper, when in his cups; a debauchee with slaves, indulging beastly lusts on his own hearthstone. Is it said there is no proof? The petitioner introduced the statements of defendant, and they are evidence; but not all. Ballentine proves that Cocke admitted, *when sober,* his carnal intercourse with slaves, and avowed his purpose to continue it, "when he pleased." Another witness proves that, when riding by, he saw defendant flying from the house to the road, and Cocke pursuing her with bridle-reins, or something, in his hand.

1. But, they say the court is *bound* to give the child to the father; and that even on *habeas corpus,* which is a writ to relieve persons from *illegal restraint.* And the same learned gentleman

who urges upon your honor the maxim of Lord Hale, that the true judge "follows the decisions," urges you to *disregard* the case of *Foster* v. *Alston*, 6 How., on the plea that the decision is *erroneous*.

Now the English case on which they rely admits that the child will not be restored to its father, if there is "*apprehension* of cruelty, or of contamination by some exhibition of gross profligacy." *King* v. *Greenbill*, 31 Eng. C. L. R. 159. A mere "apprehension" of such things is sufficient to defeat the claim of the father. That case also admits that, if the child be of proper age to express a wish, it will be left free to go "where it pleases;" but if it be very young the court will place it in "proper custody," generally choosing the father, if a proper person. This merely shows that, in some cases, the father is preferred, if it be not to the prejudice of the child. If the court went on the ground of the absolute right of the father, why does it not return to him the child who is old enough to express a choice? But here the court cannot say the father is a "proper" person. There is not only cause to "apprehend" "gross profligacy," but such profligacy is proved. There are two decrees for adultery; the continued habit of carnal intercourse with slaves; wanton exposure of person; whipping of a wife with a horsewhip, chasing her out of the house into a public road to flog her; curses and oaths in his house; curses of defendant, in hearing of her son and his present wife; proof by his present father-in-law that the house of Cocke was unfit for a *grown-up boy*. Need we add to this the shameless attempt to ruin the character of the mother of his children, by producing two witnesses to swear to matters of which he was apprized before his marriage to her—matters which he must have known, if he advised with his learned counsel, could have no legitimate bearing on this case, since he wedded in the face of reports bringing those things to his notice? Nor need we argue to show what little credence is to be given to such swearing, seeing it is disproved by the conduct of Cocke in marrying her, and by the conduct of her whole subsequent life. The lady was a mother, in good standing, of prosperous fortune, surrounded by an aged father, mother, brothers and sisters, in good standing, all respected in the community. It is an improb-

able story, told by witnesses who exhibit a disgusting. levity as they tell their revolting story. And this court is asked not only to stultify itself and credit this tale, but to deliver this child to the tender care of the man who curses the memory of her mother, and has brought such witnesses to defame her! Looking to these witnesses, it is easy to see how the slanderous report was circulated in the neighborhood.

The New York case on which they rely admits that the child will not be taken from the mother and given to the father, if it appears that he is "not a fit and proper person, *or that it would be for the interest of the child, pecuniarily or otherwise.*" 19 Wend. 19. In this case, the *pecuniary* as well as all other interests of the child require that it be left with the mother. In that case the character of the father was good, and the court seems to have laid stress on the fact that he had not misused his wife, nor "meanly and secretly outraged her affections," &c. Id. 20.

But it is not so clear that these cases declare the true rule, even of the English law. Lord Mansfield said that in cases of *habeas corpus,* "to bring up infants," the court is bound to set them free from improper restraint. "But they are not bound to deliver them over to anybody, nor to give them any privilege. This must be left to their *discretion,* according to the circumstances that shall appear before them." *Rex* v. *Delavel,* 3 Burr. 1436. Our court has only affirmed this rule, and the pretence of "crying counsel" fails. *Foster* v. *Alston,* 6 How. 460–462. Other American courts have followed the same rule. *Waldron's case,* 13 Johns. 418; *McDowle's case,* 8 Id. 328; *Woolstoncraft's case,* 4 Johns. Chan. 80; *State* v. *Smith,* 6 Greenleaf, 466–468; *Com.* v. *Addicks,* 5 Binney, 521; *Prather* v. *Prather,* 4 Des. 33, cited in 1 Hoffman Ch. R. 503; 3 Mason, 482, cited 6 How. 461; *People* v. *Mercein,* 8 Paige, 69; 2 Kent Com. 194, 195, and notes. See also an English case, *Rex* v. *Wilson,* 31 Eng. C. L. R. 161.

In the case cited from 8 Paige, the court said: "Where no sufficient reasons exist for depriving her (the mother) of the care and nurture of her (young) child, it would not be a proper exercise of discretion in any court to violate the law of nature in this respect." 8 Paige, 70. This was a case on *habeas corpus,* and the child was quite young. By looking to the case in 13 Johns.

and noticing the date of separation (1813) and the date when the trial was had, (1816,) it will be seen that the child was less than three years old; there the court note the fact, existing here, that the child was born after the parents separated. It is vain, therefore, for counsel to suggest that all our cases refer to well-grown children.

It is also vain to suggest that the adultery of the father is no ground for withholding his child from him. That rule applies only when the adultery is not committed *at home*. 31 Eng. C. L. R. 153 ; 2 Cond. Ch. R. 299.

Alike vain is it to quote the case in Dessaussure to show there must be "gross cruelty" on the part of the father, or to show that the cruelty or misconduct must be exhibited to the child. In that case there were only marks of a "switch," not a *horsewhip*, on the shoulders of the wife, and for that cause only the father was deprived of the custody of the child.

2. If Cocke had any superior rights to the custody of the child, he "forfeited" them by his adulteries. This is admitted by their books. See 2 Kinney Law Compend. 289, and case there cited ; 18 Wend. 637, *People* v. *Chegery*. Our statute expressly allows the court, on a divorce for adultery, to dispose of the children, at its discretion. Hutch. 496, sec. 7. It is true the decree in this case did not provide for the custody of the children, save by leaving the son in possession of the father, and this child in possession of the mother. If Cocke desired possession of this child, then was the time for him to apply, when the matter was before the court ; but it is obvious why he feared to do it : his claim would have been rejected. After thus waiving his claim, and permitting his wife to be decreed from him, with this child in her possession, it is now too late to controvert a matter properly involved in that suit, and especially so when his claim is founded on pretence of matters existing, if at all, before that time.

Upon a similar statute the New York courts hold that, even by his adultery, the father ceases to have a right of custody superior, if indeed equal, to the mother. 1 Hoffman Ch. R. 502. And the same rule is held, on general principles, independent of statute. 16 Pick. 204.

Clearly our statute proceeds on the ground that the father

guilty of the high crime of adultery has no *right* to the custody of his child.  If he had such a right, it becomes forfeited, and the courts must act for the best interests of the child.

In every point of view, therefore, the pretences of Cocke must fall.  He has neither parental rights which the court is bound to regard, nor qualifications it can respect.  On the contrary, the proofs show that this tender infant, in the loving care of a devoted and respected mother, is just where the court would place it.

But the court is not even put to a choice in the matter.  Cocke admits his incompetency; he does not desire the company of the child; but would send it away, as Birdsong shows, to his sister, thus depriving the little one of the care of *both* parents.  Will the court aid him?

HANDY, J., delivered the opinion of the court:

This was a writ of *habeas corpus* issued on the petition of the plaintiff in error, the lawful father of a female child of the age of two and a half years at the time of filing the petition and of about three years at the time of the hearing, seeking to recover possession of the child from her mother, who had been divorced from the plaintiff in error and had subsequently intermarried with the defendant, Hannum.

The petition claims the custody of the child on the ground that the father is entitled to the custody of her as his legal right; and because the temper, disposition, and moral character of the mother are such as to render her unfit to have the custody and rearing of the child, and to deprive her of the society which is essential to her proper rearing and education; alleging also that the respondents were about to remove the child beyond the bounds of this State.

The return to the writ states, among other things, that the respondent was constrained to separate from the petitioner in the year 1855 by his ill-treatment of her; and that in the year 1856 she filed her bill for divorce *a vinculo* from him, on the ground of adultery committed by him during their marriage; and upon due proof of that charge, that a decree was rendered divorcing them from the bonds of matrimony, but making no provision for

the children of the marriage, and that the child in controversy has since remained in the custody and under the care of her mother, who has nurtured and provided for her; that the mother is fully competent to raise the child in a proper manner, and the charge is denied that she is unfit, in point of character, to have the care and management of the child or that the child will be deprived of proper society in her keeping; and it is averred that the respondents are so situated that the child in their keeping will have the benefit of a good female school, and of an intelligent and refined society, and that they are able in point of means to educate and support her liberally. They deny that it is their intention to remove from this State, and state that they are permanently settled in Clinton in Hinds county. They allege that the father is an improper person to have charge of the child, because he is insolvent and unable to secure for her the advantages of education and society such as she ought to have; that he was divorced from the respondent Louisa for adultery in 1856, and had also been previous to his marriage to her divorced from a former wife for adultery; that he is very dissipated, given to drunkenness, profaneness, vulgarity, and low associates, so that the best interests of the child require that she should be withheld from his control and from the influence of his example.

A great mass of evidence was presented on both sides, touching the character and habits of the father for intemperance, violence, and vulgar conduct, and the charges of adultery against him; and also in relation to the character of the mother for unchaste conduct before her marriage to the petitioner and for high temper and fierceness of disposition and violence towards him during their marriage. And upon the hearing, the judge decreed that the child should be restored to the custody of the respondents. From that decree, the case is brought here by the petitioner.

The main ground taken as the basis of the claim of the plaintiff in error is, the paramount right of a father to the custody of his lawful child. This right, in the abstract, is fully recognized by the principles of the common law; and it has generally been sanctioned and enforced against the right of the mother, unless the child was so young as to render the care and attention of the mother necessary to its nurture, or unless it was shown

that the father was of such a character or in such circumstances as to render it prejudicial to the health, comfort, or morals of the child that it should be in his keeping.  Another exception to the father's right is very generally recognized; and that is, if the claim be asserted upon *habeas corpus*, and the child be of sufficient age to judge for itself and to make a rational choice where it will go, the child has a right to determine where it will go.  These principles are well established by the authorities.  Shelford Marr. and Div. 677, 678, and cases there cited.

Under the rules held by the adjudicated cases, the infant in this case is neither so young as to render the personal care and attention of the mother indispensable to its health and nurture; nor of sufficient age to choose for itself where to go.  And in these respects there appears to be nothing against the legal right of the father thus far.

But it is insisted in behalf of the defendant in error, first, that this general right is modified or lost by operation of the statute, in cases where the parties are divorced, giving to the court power, "in its discretion, to make all orders touching the care, custody, and maintenance of the children, * * * having regard to the circumstances of the parties, and the nature of the case, as may seem equitable and just;" Rev. Code, 334, Art. 17; and, secondly, that the right was forfeited by the adultery of the father, judicially established.

Upon the first point, it is very clear that the provision of the statute is incompatible with the general legal right of the father, and that, upon granting the divorce, the power of disposing of the custody of the children is conferred upon the court.  If then exercised, there could be no question but that it would deprive the father of the custody.  Is there any reason why the same result should not take place, whenever after a divorce a court should be called upon to determine the question, in whose keeping would the welfare of the child be best promoted ?   We think not.  After the divorce, the welfare of the child is the governing consideration.  By the misfortune of its parents, it must be deprived of that care and attention from both of them which were due to it, and it generally must be committed to one of them. It would be most unjust both to the child and to the mother that

it shall be committed to the keeping of an unworthy father, whose misconduct may have caused the divorce from the mother, thereby inflicting a double wrong upon her as well as an injury upon the child. It is, therefore, but just, whenever, after a separation by divorce, the question of the custody of the child arises, to regard the mere legal right of the father as at an end, and to place the child in the custody of the parent best calculated under all the circumstances to promote its welfare, or, if they both be objectionable, even in the keeping of another person.

In the State of New York, a statute containing similar provisions to those of our statute has been held to neutralize the rule of the common law in relation to the paramount right of the father after divorce, and to place the parents on an equality as to the future custody of the children. *Ahrenfeldt* v. *Ahrenfeldt*, 1 Hoffman Ch. R. 496.

The second position is manifestly well founded. The paramount legal right of the father proceeds on the idea that he performs his duty to the child and to the marriage relation, and does nothing to forfeit his right. But the mother still has an interest in the child, the fruit of the marriage, and the object of interest and affection alike to both parties. It came into existence, and became the common object of affection and interest to both parents, under an obligation of fidelity to the marriage relation. If that duty had been performed, the child would have remained in the keeping of both parties, and no controversy would have taken place. But the father should not be permitted, when his own violation of duty had produced a dissolution of the marriage tie, to deprive the mother of her child to which she was entitled by fidelity to the marriage vow. Hence it has been held that the right of the father is forfeited by his misconduct; *The People* v. *Chegery*, 18 Wend. 637 ; and surely no misconduct on the part of the husband is more flagrant than adultery.

It is most just that the consequences of his own guilt should be visited upon him and not upon the injured mother. But the rule which would give him the custody of the child under such circumstances would reward the guilty and punish the innocent. It would put it in the power of a profligate husband, after having outraged the rights and destroyed the happiness of a wife, to com-

mit the further wrong of depriving her of her child, which might be the only comfort left her. The contrary rule is not only one of justice and humanity to the innocent wife, but it would have a tendency to strengthen that bond of the marriage relation consisting in the love which the father has for his children, and which would induce him to be faithful to his marriage vows in order not to lose the society and comfort of his children. The rule here contended for would be calculated to weaken that bond of union between husband and wife.

We therefore think that the claim here set up, founded on the mere legal right of the father, cannot be maintained under the circumstances of this case.

The remaining ground upon which the claim of the father is placed involves the question of the fitness of the father and mother respectively to have the custody and nurture of the child.

The testimony on this point is voluminous and involves many disagreeable details in reference to the character, conduct, and habits of the parties.

Without a particular statement of its details, it is sufficient to say that it shows that the father has been twice divorced for adultery, (one case being at the instance of the mother of the child in controversy,) but is now living happily with a woman of good character and standing, whom he has since married; that he is a regularly graduated physician and in good practice in the best society in his neighborhood, and able to support and educate the child; that the child in his custody would be admitted to the best society in his neighborhood; that he is a man of good temper and intelligence when sober, but is addicted to intemperance, and during the period of such indulgence his conduct is habitually that of a man lost to the decencies and duties of life, given to the grossest vulgarity and obscenity in action and language in the presence of his family and others; and that he admitted that his adulterous conduct was the cause of disagreement and separation and subsequent divorce between him and the mother of this child.

The testimony tends to show that the mother was frequently under violent anger and excitement towards the father in broils which took place between them when he was in a state of intoxi-

cation; that she once inflicted a severe blow upon him with a hatchet when he was about to whip her with a horsewhip, and on other occasions prepared and exhibited weapons to protect herself against him; that she was charged with incontinence and lewdness before he married her, but that he considered the charges false and married her with a knowledge of them. It is shown in her behalf that she resides in the town of Clinton, and that her character there is unexceptionable, and she is visited by the most respectable ladies of the town; that she is remarkable for attention to the education and morals of her children, and has another daughter by a former husband, of some fourteen years of age, who has been much with her, and is well raised; that she is remarkable for her fondness and solicitude for her children, and has the benefit of a good female school where she resides at which to educate this child, and where her other daughter is receiving her education; that she lived on terms of affection and harmony with her first husband, and her conduct as a wife and mother were then unexceptionable.

From this brief statement of the substance of the testimony in relation to the comparative fitness of the two parties to have the keeping and tuition of a female child of the tender age of about three years, there can be no doubt that the father is positively unfit for the duties.

The rule laid down upon the subject is, that "if there are well-founded apprehensions of the father's acting with extreme harshness or cruelty, or with gross profligacy or immoral conduct, so that the child would be in danger of contamination, the court will not order the child to be delivered to him." Shelford, 678.

Applying this rule to the case, it is very clear that a father who has been twice divorced for adultery, is addicted to intemperance to such an excess as to be guilty of the grossest vulgarity and obscenity in actions and in language, regardless of the presence of others, male or female, is unfit to have the training of a female of very tender years, and to impart to her by precept and example those principles of virtue and morality, and those feelings of delicacy and refinement, which are the true excellence of the female character. With such a person, there would be

every reason to apprehend damage from the contamination of immoral conduct.

On the other hand, whatever objections may once have existed to the fitness of the mother by reason of the charges against her chastity and amiability—and they come with an ill grace from the husband—the testimony is very clear that, in point of respectable standing in the town of her residence at the present time, of fondness for her children and of care and solicitude for their education and morals, no ground for objection now exists against her. In addition to this, she is the mother of the child, has reared it thus far from its birth, and her attachment to it must render her a much more fit person to attend to the wants of a child of such tender years than a stranger into whose keeping it must be placed if delivered to the father.

Upon the whole case, we consider the judgment correct, and it must be affirmed.