## DUNCAN ET AL. *v.* DUNCAN.

[80 South. 697, In Banc.]

1. DIVORCE. *Custody of children.*

The right of the father under the common law to the custody of his legally begotten minor child as against its mother, in a contest between them, has been modified by our statute, Code of 1906, section 1673 (Hemingway's Code, section 1415), to the extent that, while due regard should be paid thereto, the best interest of the child is now the question for prime consideration, and it should be placed in the custody of the parent best calculated, under all the circumstances, to promote its welfare.

2. DIVORCE. *Custody of child.*

The fact that a father drinks whiskey and plays poker to a limited extent, does not make him an unsuitable person to intrust with the custody of his child.

3. DIVORCE. *Custody of minor child.*

Where a father is financially able to take care of his minor child and the mother is not, the father will be given the custody of the child, if he is a suitable person.

4. SAME.

The fact that if the mother is given the custody of the child, it will be taken out of the state and thus render the courts of this state powerless to afford the father any relief, he might become entitled to under changed conditions, while not controlling, should be considered along with the other facts in the case.

5. Same.
  Where a husband obtained a divorce on the ground of adultery and hardships will necessarily follow any decree awarding the custody of the child, still justice demands that such hardspips shall fall lightest on the unoffending party.

Appeal from the chancery court of Alcorn county.
Hon. A. J. McIntyre, Chancellor.

*Habeas corpus* proceedings by Harmon Duncan by next frend, Amanda Duncan, against Geo. B. Duncan, and others. From a decree granting the petition, Geo. B. Duncan and others appeal.

The facts are fully stated in the opinion of the court.

*W. C. Sweat,* for appellant.

*J. M. Boone* and *Thos. H. Johnston,* for appellant.

Smith, C. J., delivered the opinion of the court.

George B. and Amanda Duncan were formerly husband and wife, and have one child, Harmon Duncan, a boy, to determine the right to the custody of which this *habeas corpus* proceeding was instituted, and who, when the decree appealed from was rendered, was seven years of age. In September, 1916, trouble arose between Mr. and Mrs. Duncan, because of which they finally separated in March following; George suing for and obtaining a divorce from Amanda on the ground of adultery on the 11th day of February, 1918, in the circuit court of Madison county, Tenn.; the decree then entered reciting:

"That defendant is guilty of adultery as charged; though complainant has condoned one offense, there are others proven, and he has not condoned the same, or been guilty of a like offense, and the conditions of his condonation were not complied with."

The child was taken charge of by George, and was placed by him in the care of his (George's) father and mother, J. R. and Sallie Duncan, who live at Corinth,

Miss. In July, 1917, a writ of *habeas corpus* was sued out before Hon A. J. McIntyre, judge of the chancery court of Alcorn county, Miss., by Harmon Duncan, by his mother as his next friend, by which it was sought to have his custody transferred to his mother, and to which his father and grandparents were made defendants. The decree rendered on the trial thereof on August 1, 1917, recites:

. "Came on for hearing this cause on petition of Harmon Duncan, by his mother and next friend, Amanda Duncan, answer of respondents, George B. Duncan, J. R. Duncan, and Sallie Duncan, cross-petition of the said respondents, answer to cross-petition, and oral proof before the chancellor in vacation on the 1st day of August, 1917; and, after hearing the case on said date, and taking the same under advisement, and after due consideration, it appearing to the satisfaction of the court from the proof that the little boy, Harmon Duncan, whose custody is in controversy in this case, will for the present be under better influences at Corinth, Miss., than at Cairo, and that it is for the best interest of the child that his care, custody, and control be awarded to the respondents, Geo. B. Duncan,. his father, and his paternal grandparents, J. R. Duncan and Mrs. Sallie Duncan:

"It is therefore ordered, adjudged, and decreed that, so long as circumstances remain practically as they are at present, the care, custody, and control of the said minor, Harmon Duncan, be awarded to the respondents, George B. Duncan, J. R. Duncan, and Mrs. Sallie Duncan; and

."It is further ordered that the care and control of the said minor be and is hereby reposed in his paternal grandparents, J. R. Duncan and Mrs. Sallie Duncan, to be supported and provided for by his said father, George B. Duncan.

"It is further ordered that this order be and is hereby a temporary order, so long as conditions and circum-

119 Miss.—

stances remain the same; and should circumstances change, so as to make it proper and advisable to change this decree and change the custody of the said minor, the same may be done on proper petition for that purpose, or by this court of its own motion, but for the present the care, custody, and control of the said minor is awarded as hereinabove stipulated.

"It is further ordered that Mrs. Amanda Duncan is hereby permitted to visit said child at the home of the said J. R. and Mrs. Sallie Duncan, and that she shall be treated courteously and considerately while on said visits."

On March 16, 1918, a petition was filed in the chancery court of Alcorn county, in the name of Harmon Duncan, by his mother as his next friend, to which George, J. R., and Sallie Duncan were made parties defendant, praying that the custody of the child be awarded to its mother. This petition sets forth the decree entered on the former trial, and avers that Amanda is a proper person to and should have the custody of the child; that "the conditions and circumstances are different from those shown to the court to exist at the former trial;" but does not aver wherein they are different, except an averment, not supported by the evidence, that "George Duncan has since the trial of this case brought whiskey into the state of Mississippi, contrary to the laws of the United States and the laws of the state of Mississippi, to be sold in the state of Mississippi, contrary to the laws of said state." The petition contained a further averment that:

"The defendants have violated said decree heretofore rendered in this cause in a manner to be shown on the hearing hereof. Petitioner further avers, on information and belief, that J. R. Duncan and Mrs. Sallie Duncan, two of said respondents, and the paternal grandfather and grandmother of said child, or both or one of them, have been exercising their influence since the former trial of this cause over said child to destroy

its love and affection for its mother, the said Mrs. Amanda Duncan.''

On April 14th the prayer of this petition was granted; the decree then entered, and from which this appeal was taken, reciting that:

''Be it remembered that the above-styled cause came on for hearing and was heard on the 23d day of March, 1918, it being the sixth day of the regular March term, 1918, of the chancery court of Alcorn county, on the petition of Mrs. Amanda Duncan, mother and next friend, to set aside the temporary decree made and entered on the 7th day of August, 1917, in said cause, and to award the care and custody of the said Harmon Duncan to the said Mrs. Amanda Duncan, his mother, answer of J. R. Duncan, Sallie Duncan, and George Duncan to said petition, oral proof in open court, the stenographer's notes of the testimony taken at the former hearing of said cause, and said temporary decree, and the court, after hearing said cause, by order duly made and entered on the said 23d day of March, 1918, took said cause under advisement for a decree is vacation; and it appearing to the satisfaction of the court from the proof that the petitioner is entitled to the relief prayed for in said petition, and that said cause should be reopened and said temporary decree, made on the 7th day of August, 1917, be vacated and set aside, and that the care, custody and control of the said Harmon Duncan should be awarded to the said Amanda Duncan, his mother; and it further appearing to the satisfaction of the court that the said George Duncan, father of said Harmon Duncan, should have the privilege of visiting the said Harmon Duncan at the home of his said mother at reasonable times, and should have the privilege, if he so desires, of having said child visit him in the home of the said J. R. Duncan and Sallie Duncan for two months each summer at Corinth, Miss.:

''It is therefore ordered, adjudgel, and decreed that said temporary decree, made and entered on the 7th

day of August, 1917, be and the same is hereby vacated and set aside, and the care, custody, and control of the said Harmon Duncan be, and the same is, hereby awarded to the said Amanda Duncan, his mother.

"It is further ordered, adjudged and decreed that the said George Duncan shall have the privilege of visiting the said Harmon Duncan in the home of the said Amanda Duncan at all reasonable times, and that the said Harmon Duncan shall be permitted to visit him for two months each summer in the home of the said J. R. Duncan and Sallie Duncan at Corinth, Miss., should the said George Duncan so desire."

Both of the decrees herein rendered seem to be predicated upon the theory that the judge in a *habeas corpus* proceeding to obtain the custody of a child, can exercise all of the powers conferred by section 1673, Code of 1906 (section 1415, Hemingway's Code), upon the chancery courts in divorce cases to make all orders touchthe care, custody, and maintenance of the children of the marriage as may be equitable and just under the circumstances of the parties and the nature of the case, and the right of the judge so to do is not here called in question, and consequently will not be determined.

The contentions of counsel for the appellant are, in effect, that, first, the decree rendered on the first trial is conclusive of the rights of the parties hereto, unless the circumstances surrounding them have materially changed since it was rendered, and that no such change in the circumstances have been shown; and, second, should that decree be held not to be conclusive, then under the evidence the mother should not have. been awarded the custody of the child.

The contentions of counsel for the appellee are, in effect, first, that a judgment or decree entered in a *habeas corpus* proceeding to determine the right to the custody of a child is not *res adjudicata* of the rights of the parties thereto; either under section 2466, Code of 1906 (section 2032, Hemingway's Code), or the gen

eral law; or, second, if *res adjudicata* to any extent, then only of the rights of the parties as they existed when the judgment or decree was rendered, and that the circumstances surrounding the parties hereto have so materially changed since the former decree herein was rendered as to require the custody of the child to be awarded to its mother; and, third, if mistaken in both of the foregoing propositions, the first decree herein rendered cannot be held to be *res adjudicata* of the rights of the parties hereto to any extent whatever, for the reason that it made only a temporary disposition of the child, and left the question of its permanent disposition open for determination in subsequent proceeding, and that this question should now be and was rightly determined by the decree appealed from.

We will assume for the sake of the argument, but without deciding, that the order first entered made only a temporary disposition of the child, and that on the second trial all questions touching the final disposition thereof were open for determination. The evidence presented to the court below, as it appears from the record, is in substance as follows:

George Duncan is, and was when the events hereinafter set forth occurred, a baggageman on the trains of the Mobile & Ohio Railroad Company, his run being from Cairo, Ill., through Jackson, Tenn., to Okalona, Miss., and return, with a lay-over at each place; the longest being at Jackson, Tenn., at which place he and his wife lived during practically all of their married life. The house in which they lived was larger than their necessities required, so that they permitted several rooms thereof to be occupied by other persons, among whom was a man by the name of Howard, with whom, during her husband's absences, Amanda practically lived in an immoral relation. She has the reputation in Jackson, Tenn., of being a woman of unchaste character. After discovering the relations which existed between Amanda and Howard, George abandoned her, obtained

the divorce hereinbefore referred to, and placed the child with his father and mother at Corinth; his work interfering with his personal care and supervision of it. The child's grandparents are people of high character and are properly caring for it; George bearing the expense thereof.

Amanda denied that her relations with Howard were immoral or in any way improper, but introduced no testimony relative thereto, other than her reputation for chastity in Cairo, except her own, and the fact that her relations with Howard were such was abundantly proven. After George left her she returned to, and is now living with and is supported by, her father, who seems to be a most excellent gentleman, and is the superintendent of the buildiings and grounds of the public schools of Cairo, Ill. She lived in Cairo prior to her marriage, and her reputation there along all lines was then, and is now, good. Prior to her marriage she was active in church work, and since her return to Cairo she has engaged therein, being now a teacher of a class in, the superintendent of'the cradle roll of, and on the entertainment committee of, a Sunday school, and is a vice president of the Epworth League.

Amanda has no occupation and no property, other than a one-fifth interest in the estate of a deceased grandmother, the value of which estate is said by one of the witnesses to be five thousand or six thousand dollars, but the liabilities thereof and charges thereon, if such there be, do not appear. Her father's income consists of his salary of ninety dollars a month as superintendent of the buildings and grounds of the public schools at Cairo, and in addition to Amanda he supports another daughter. There are a number of saloons in Cairo, to one of which the residence of Amanda's father is in close proximity, and it is also in close proximity to the city's "red light" district; but other people of the highest respectability live near him, and his and his family's social position is good.

Amanda, her brother, and father testified that George (and he admitted that he) drinks whiskey and plays poker; but, allowing for the evident desire of Amanda and her brother to state the case most strongly against George, the evidence does not disclose that he is either a common gambler or a habitual drunkard. Amanda claims that George ''made a gambling den and whiskey shop and assignation place of ''her house during her absences therefrom, but the only evidence introduced by her in support thereof was that George told her that he had done so. This statement, as well as the fact itself, was denied by George, and the neighbors had no cause to suspect that such was the case. George stated that on one occasion Amanda's brother and two of the men rooming in the house brought several lewd women there without his consent, and that as soon as he discovered their presence he made them leave. George was reputed in Jackson, Tenn., to be a sober, honest, and moral man.

Amanda has visited the child three times since the first decree was rendered, remaining each time several days. She complains that on her first visit she was treated discourteously by the child's grandparents, and was not permitted to enter their home. The facts in this connection are that the house in which J. R. and Sallie Duncan live belongs to one of their sons, and he objected to Amanda's coming there. The child was sent to Amanda's boarding house each morning while she was in Corinth, and was permitted to remain with her during each day.

The right of the father under the common law to the custody of his legally begotten minor child, as against its mother, in a contest between them, has been modified by our statute, which appears as section 1673, Code of 1906 (section 1415, Hemingway's Code), to the extent that, while due regard should be paid thereto, the best interests of the child is now the question for prime consideration, and it should be placed ''in the custody of

the parent best calculated under all the circumstances to promote its welfare." *Cocke* v. *Hannum,* 39 Miss. 439.

Before George and Amanda separated, the child, the fruit of their marriage, was cared for by them jointly. It came into existence and became the common object of their affection under an obligation on the part of each of fidelity to the marriage vow. Had that vow been kept, it would have remained in their joint care, and this unfortunate litigation would not have arisen. George's home, on the continued existence of whch the joint care of the child by himself and Amanda depended, had been broken up by Amanda's misconduct, and it would be, not only unjust, but also contrary to the law to permit her also to deprive him of his child, unless its welfare would be promoted thereby, which question will now be taken up for consideration.

The child has long since passed the age prior to which it requires attentions of such character as can only be fully given by its mother, and it can now be cared for by another equally as well, barring the absence of such care as springs alone from a mother's love.

Its father is able and desirous of supporting it, and at his request it is being cared for by its grandmother, the person of all others, next to its mother and father, to whom it would naturally become an object of interest and affection. The only charges against its father which arise to the dignity of proof are that he drinks whisky and plays poker to a limited extent; and while we freely admit that such habits are bad, we are not prepared to say that the indulgence therein by a father of themselves alone makes him, in the eyes of the law, an unsuitable person to intrust with the custody of his child. If the law were otherwise, many fathers in the past would have been, and we dare say many in the future would be, deprived of the custody of their children.

The evidence does not indicate that the child will be cared for by Amanda any better than it is being cared for by its father and grandmother, and the absence of those attentions which spring from a mother's love will be, to a large exent, offset by those which spring from a father's love. Amanda has no means of supporting the child, other than her small interest in the estate of her grandmother, she herself being largely dependent upon the charity of her father, and his income must already be overtaxed in the support of his family as now constituted. In the very nature of things as they now exist, the child must be supported by its father, or else it will suffer. Moreover, if given to Amanda, the child will be carried by her beyond the jurisdiction of the courts of this state, which would thereby be rendered powerless to afford the father or the child any relief he or it might become entitled to under changed conditions in the future. This would not alone be controlling, but may be here very properly taken into consideration along with other facts in the case.

Hardships will necessarily follow any decree that could be herein rendered, and justice demands that, if possible, they be so distributed as to bear lightest on the unoffending party. That Amanda was not permitted to visit the child in the home of its grandparents is not here material. Under the circumstances, they could hardly be expected to permit her to do so.

It is said by Amandadd's cousel that this is in reality not a contest between George and Amanda, but between Amanda and the child's grandparents. We no not so understand the record. Its grandparents are simply caring for the child at George's request, he retaining his parental authority over it, so that the first decree simply approved an arrangement which George had already made; the obligation to care for and support the child still remaining on him.

The decree of the court below will be reversed, and the petition dismissed.

*Reversed and dismissed.*

Holden, J. (dissenting).

The majority opinion is clearly wrong, and I wish to record my reasons for declining to assent thereto.

Briefly put, the majority decision flatly reverses the chancellor upon the exercise of his judicial discretion, based upon the implied finding of fact, which finding is amply and abundantly supported by the competent, credible testimony in the case. The opinion does not, and cannot, say that the discretion exercised under the facts is not warranted by the law and testimony, nor that the discretion was manifestly abused, but seems to go upon the theory that this court should determine the truth of the conflicting testimony, and settle the question of fact as well as law, regardless of the finding of the truth by the chancellor. This I think is contrary to the rule in this state.

The paramount right of the father under the common law to the custody of his child against its mother, in a contest between them, has been annulled by our statute, and vests the question solely in the judicial discretion of the court, and provides that "the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just make all orders touching the care, custody, and maintenance of the children of the marriage." This is the modern rule as established by the statute and the decisions of this court. Section 1673, Code of 1906 (section 1415, Hemingway's Code); *Cocke* v. *Hannum*, 39 Miss. 423.

In the case of *Dawson* v. *Dawson*, 57, W. Va. 534, 50 S. E. 619, 110 Am. St, Rep. 813, the court quoting from Judge Brannon, said:

"The law as to the custody of the children has been greatly modified. Formerly the right of the father to

its custody was almost an inflexible rule. That rule forgot that a mother had a heart. The real owner of the child, be it even a baby, must give it up. But civilization, advanced thought, and human kindness have bent this iron rule and opened the ears of courts to the pleading of the true friend and owner of the child. The courts do not, these days, inexorably take from mothers their children of tender years, even for the father, if the mother is a fit person and has a home for them, but look at the circumstances. The welfare of the child is the test.''

There is no dispute as to the rule being that the best interest of the child is the question for prime consideration and that it should be placed in the custody of the parent best calculated under all the circumstances to promote its welfare. Therefore the question here is whether or not the decision of the chancellor upon the facts, in the exercise of his judicial discretion, should be set aside, and, if so, for what reason and upon what ground.

It stands out as a mountain peak in the main opinion that the alleged adultery of the mother of this six year old son is the moving cause that prompts the majority conclusion herein. This immoral charge against the wife, Mrs. Duncan, was denied and disputed by credible testimony, which the chancellor had a right to believe and did believe, as evidenced by his decree giving the custody of the child to the mother. At all events, the alleged act of adultery complained of, if true, occurred about eighteen months before this last petition for the custody of the child was filed. In the meantime, after the date of the alleged occurrence, the mother had returned to the roof of her parents and was living a reformed life amid moral and Christian surroundings . That she had reformed was established by the strongest kind of undisputed and overwhelming proof. She taught in the Methodist Sunday School, and was an officer in the Epworth League, and her moral character was shown

to be above reproach. She was thus living at her old home, from whence she had been taken by her husband five years before, and her character then was spotless and pure in innocent girlhood. The divorce granted in Tennessee for adultery, referred to by the main opinion was, in effect, an *ex parte* proceeding, in her absence, long before the case here was heard. After she had lived eighteen months of an undisputed moral and upright life back in her father's home, was it manifestly wrong for the chancellor to believe and hold that she had truly reformed, if she was ever in fact immoral? The evidence certainly justified such finding by the court, and I can see no good reason for disturbing it. In this enlightened day of charity and justice to the weak and fallen, no prescribed time can be fixed in which to judge a moral reformation. High authority gives instances of early redemption when the sin has been forsaken. The chancellor evidently believed she had proven her good character after her return to her old home in Cairo. See page 442, *Cocke* v. *Hannum*, 39 Miss. *supra*.

But this is not all that justified the discretion exercised by the chancellor. Mr. Dunacn, the husband, returned and dwelt with his wife for many months at Cairo after the date of the alleged act of adultery. If the charge was ever true, he condoned it; and grave doubt is reasonably entertainable from this record as to whether it was true. He must have doubted it. His conduct speaks so. At all events there is no charge against her character for at least eighteen months before this suit was filed.

Then again, as to the question whether the mother or father was the most suitable person with whom to place the cutody of the child, the testimony before the chancellor showed that the husband, Mr. Duncan, was indeed no saint; that he gambled, drank liquor, wrongfully brought liquor into the state, and used his home for immoral purposes, in her absence, even to the ex-

tent of having lewd women there while the gambling and drinking was going on. He admits part of this, and denies part. Nevertheless the chancellor was warranted by the proof in believing him guilty of immorality. Of course, if a double standard of morality is to be indulged, and the man can escape his sins and iniquities, while the weaker party, the woman, must pay the penalty, without a chance or hope of redemption, then the soundness of the majority opinion on the facts becomes more apparent. But at the bar of justice and righteousness, especially in a Christian civilization, no such standard should be recognized or countenanced.

The surroundings and influences in which the husband placed this innocent girl wife and left her must have also impressed the chancellor in his investigation. I shall not detail these surroundings as shown by the record, but will say that the lower court very probably thought, from the proof, that the husband should have abated the evil temptation which the wife was daily subjected to while he was away on the road, all of which he knew, or should have known.

Furthermore, the chancellor's decree is right, because the conditions and circumstances had materially changed between the date of the first and second decrees herein. The principal changes were that the mother had reformed, if ever guilty, and had a home and support with the father; and she had also come into the possession of considerable property by inheritance, it appearing that she was possessed of sufficient means with which to support, maintain, and educate her child. However, it is the duty of the father to furnish support for his child. The first decree was only a temporary award of the custody of the child to the father, and was properly reopened and changed by the court under its terms and the proof of new conditions and circumstances.

Of course, the primary inquiry is, what is the best interest of the child? and in deciding this question the

suitableness of the party to whom the child is to be awarded is for the sound judicial discretion of the trial judge. He may take into consideration all the facts and circumstances in evidence in reaching his conclusion based on the facts before him. The chancellor did not believe from the proof that Mrs. Duncan was an unsuitable person for the custody of the child. He did not believe that she had been guilty of adultery, or, if so, then he believed that she had reformed. By his decree he refused to "cast the first stone." But the majority of this court finds the fact here that brands her with the "scarlet letter" and takes from her her only child, the dearest thing on earth to her; and this, too, in face of the justified discretionary finding by the chancellor that the mother was the most suitable person to have the custody of the child. The chancellor being on the ground, so to speak, having seen and heard the witnesses as to the facts and circumstances, and determined the truth thereof, I think his judgment as to the welfare and best interests of the child is safer than that of this court, with only the dry record before it.

Notwithstanding that the test is the welfare of the child in such cases as the one before us, I think the parents also have some respective rights and interests therein; and in all cases where the suitableness between the mother and father is in question, and it does not clearly appear by a preponderance of the evidence that the father is the more suitable person to have the custody of the child, and that the child will fare better generally with the father, then its custody, especially when of tender years, should be awarded to the mother. The natural mother love of a mother for her child is such, in my opinion, that no other person on earth can administer to the care and welfare of her child the same as she can and would. There is peculiarly no limt to the love and affection of a mother for her child; and I believe that, even though she be handicapped with poverty and human weaknesses, her care and protection

of her offspring is more naturally efficient than that of any other person who might be more fortunately situated and endowed. It is harsh and cruel to forcibly separate a mother from her child, and it should not be done, in my judgment, except in certain cases, where there can be no reasonable doubt that the welfare of the child requires such separation.

The main opinion states that the child "became the common object of their affection." This is quite true, but I think no man will hardly contend that the strength of the father's affection for the child is equal to that of the mother. He has his rights in the premises, 'tis true; but she is the one whose responsibility is greatest and whose life is fraught with the dangers and cares of motherhood. Of the two, it has always appeared to me that the mother, by the very law of nature, possessed greater interest in the child than the father, so it is best for its future, and also just to the mother, to give its custody to her in all cases, unless it is clear and certain that to do so would be injurious to the best interests of the child.

The chancellor in this case had all these considerations and questions of fact before him at the trial, and I am convinced that his decree granting the custody of the child to the mother was not a manifest abuse of his discretion, and should not be reversed by this court. That the decree of the chancellor puts the child beyond the jurisdiction of the court cannot be considered a determining factor in this character of case, if the decree is otherwise right in awarding the custody to the mother, for the reason that a denial of a right because the party entitled thereto lives outside of the state would be obviously wrong. The father took the child away from Cairo in the first instance.

The main opinion states that—"There are a number of saloons in Cairo, to one of which the residence of Amanda's (Mrs. Duncan's) father is in close proximity, and it is also in close proximity to the city's 'red light'

district; but other people of the highest respectability live near him, but his and his family's social position is good."

I do not think this is controlling argument in support of the majority opinion. In the first place, what the main opinion terms "in close proximity" is in fact a distance of several blocks. This fact cannot be very persuasive in this case because many thousands of the best people living in cities that permit these iniquitous resorts live "in close proximity" to such vile places, yet it cannot be said that these good people are necessarily in danger of being infected thereby. Furthermore, with the general cleaning up that has been brought about during the recent world war, and the fact that national prohibition will soon eradicate all saloons, I think the evils pointed out will be destroyed, and even Cairo will become a comparatively clean city in which to live.

The father's occupation on the rail road, as we understand the record, takes him to Cairo, where he can visit the child oftener and with less difficulty than he could at its grandparents' abode in this state.

The main opinion indicates that the award in this case by the majority decision is really in effect to the grandparents of the child. If this is true, then by all the rules of law and reason the decree should be affirmed here, because, if the controversy is between the grandparents and the mother here, there could be no doubt whatever as to the correctness of the decree of the lower court.

I think the decree of the chancellor should be affirmed by this court, with a provision in it allowing the father ample opportunity to visit the child, so that he may bestow upon it his affection and fatherly advice.

ETHERIDGE, J., joins in the above dissenting opinion.