956 So.2d 337 (2007)
Christina MAYFIELD, Appellant
v.
Joel MAYFIELD, Appellee.
No. 2005-CA-01576-COA.
Court of Appeals of Mississippi.
May 1, 2007.
*340 Walter Wesley Teel, attorney for appellant.
Wendy C. Hollingsworth, Ocean Springs, attorney for appellee.
Before MYERS, P.J., IRVING and BARNES, JJ.
IRVING, J., for the Court.
¶ 1. Joel and Christina Mayfield agreed to an irreconcilable differences divorce and submitted two issues to the Harrison County Chancery Court for decision: custody of their two minor children and equitable division of the marital home. The court awarded custody of the children and the marital home to Joel. Aggrieved, Christina appeals and asserts the following issues, which we quote verbatim:
1. The chancellor erred in granting custody to the appellee, and as a matter of law committed manifest error under Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983) by failing to properly apply the Albright factors, singling out certain factors and placing undue emphasis on other factors instead of considering them as a whole and thereby not properly analyzing and making the appropriate findings as to each factor.
2. The court erred in allowing the use of the psychological report of Don Hughes to be used in evidence to cross-examine him.
3. The court improperly allowed into evidence certain statements under the "excited utterance" exception to the hearsay rule.
¶ 2. Finding no reversible error, we affirm.

FACTS
¶ 3. Joel and Christina were married on December 9, 2000, in Harrison County, Mississippi. Two children were born to the parties prior to the marriage: Abbey, born November 3, 1998, and Joel, Jr., born August 11, 2000. The parties separated on or about November 29, 2001.
¶ 4. On March 1, 2002, Joel filed a complaint for divorce. Christina responded on March 7, 2002, by filing an answer and counterclaim for divorce. Both parties filed motions for temporary relief, and on June 27, 2003, the court held a hearing to determine which party would be awarded temporary custody. The court ordered the parties to share custody of the children, alternating weeks, until a full hearing could be held to determine permanent custody. The court also issued an immediate temporary injunction against Don Hughes, Christina's paramour,[1] enjoining him from having any contact with the children. *341 The court also prohibited Anthony, Joel's brother, from having unsupervised contact with the children and ordered that he not be present in the home when the children came to Joel's home for overnight visits.
¶ 5. On September 3, 2003, a three-day hearing commenced. At the close of the hearing, the chancellor appointed a guardian ad litem and ordered that a home study be conducted by the chancery court clinician. On October 10, 2003, the court entered a second temporary order granting primary custody to Christina and visitation privileges to Joel. The court ordered that Anthony have no contact with the children and specifically ordered that Hughes be "totally isolated from the children." Nevertheless, Christina continued to allow Hughes to have contact with the children.
¶ 6. A hearing was held on November 17, 2003, where the chancellor heard from the guardian ad litem who had filed an interim report in which she made a recommendation to the court that it consider making a temporary change in custody and visitation. On November 26, 2003, the chancery court issued a third and final temporary order which modified its prior custody award by granting temporary physical custody to Joel. On July 8, 2005, the chancellor entered a final judgment of divorce, in which he awarded primary physical custody to Joel, and visitation privileges to Christina. The chancellor also ordered Christina to keep the children away from Hughes until she and Hughes were married, and until Hughes presented to both the court and Joel certification documenting his successful completion of an anger management course. It is from this judgment that Christina appeals.
¶ 7. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Custody
¶ 8. Christina contends that the chancellor failed to properly apply the Albright factors, and therefore erred in awarding custody to Joel. "[An appellate court] will not disturb a chancellor's judgment . . . unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Chapel v. Chapel, 876 So.2d 290, 292-93(¶ 8) (Miss.2004) (citing Townsend v. Townsend, 859 So.2d 370, 371-72(¶ 7) (Miss.2003)). "On appeal [an appellate court] will not reverse a chancery court's factual findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence in the record supporting these findings of fact." Smith v. Jones, 654 So.2d 480, 485 (Miss.1995) (quoting Cooper v. Crabb, 587 So.2d 236, 239 (Miss.1991)).
¶ 9. In Albright, the Mississippi Supreme Court enumerated twelve factors that chancellors must consider in making custody determinations: age, health and sex of the child; which parent had continuity of care prior to the separation; which parent has better parenting skills; which parent has the willingness and capacity to provide care for the child; employment status of the parents, including responsibilities associated with employment; age and physical and mental health of each parent; the emotional bond between parent and child; parents' moral fitness; "the home, school and community record of the child;" the child's preference, provided that the child is old enough to express such preference; which parent has a more stable home and work environment; "and other factors relevant to the parent-child relationship." The chancellor is mandated to *342 make a decision in light of all of these factors, while keeping in mind that "the polestar consideration in child custody cases is the best interest and welfare of the child." Id. at 1005. The chancellor thoroughly considered all of the Albright factors. Therefore, as we will discuss below, we find no error in the chancellor's finding that it is in the best interest of the children that their primary custody remain with Joel.
Age, Health, and Sex of the Children
¶ 10. The chancellor found that this factor favored neither party. Christina argues that this factor should have weighed in her favor, and she points out that Hughes has been accused of abuse, but he has "never been arrested nor charged with any abuse toward either one of these children  or any child for that matter." It is Christina's contention that there is no proof that either she or Hughes has harmed the children in any way, because the children have never had to see a psychologist or undergo any type of psychological testing.
¶ 11. Christina also argues that this factor should have weighed in her favor because the children are young. Although Christina acknowledges that the tender years doctrine has been weakened by Albright, she still argues that she should have been awarded custody of the children. In Albright, 437 So.2d at 1005, the court stated: "Age should carry no greater weight than other factors to be considered." In Lee v. Lee, 798 So.2d 1284, 1289(¶ 17) (Miss.2001), the Mississippi Supreme Court stated: "the age and sex of a child are merely factors to be considered under Albright, and this Court has significantly weakened the once strong presumption that a mother is generally best suited to raise a young child." Furthermore, in Torrence v. Moore, 455 So.2d 778, 780 (Miss.1984) (citing Duncan v. Duncan, 119 Miss. 271, 80 So. 697 (1919)), in discussing the tender years doctrine, the Mississippi Supreme Court stated that "a child of 7 [years of age] has been held by this Court to be long past the age prior to which it [sic] requires attention of such a character from the mother." Presently Abbey is eight years old and Joel, Jr. is six; thus the tender years doctrine is clearly inapplicable to Abbey, and presumably inapplicable to Joel, Jr., as well, since at age seven a child is long past the age that the child requires the special attention of the mother.
Continuity of Care
¶ 12. The chancellor found that this factor did not favor either party. The chancellor also found that the parties shared in the care of the children prior to their separation, although he noted that Joel's mother provided considerable assistance. Christina contends that she took care of the children a great deal of time, as she did not work outside the home immediately following the birth of the children. However, Christina testified that she received assistance from her grandparents, with whom she was living at the time, and from Joel's parents, because she was still in high school and working part-time. She also testified that Joel helped with Abbey at night, so that she would be rested for school the next day.
¶ 13. In the fall of 1999, Christina was working full-time as a deputy clerk at the Biloxi courthouse, and Joel was working as a volunteer with the D'Iberville Fire Department, in addition to other part-time employment. Christina argues that the testimony reveals that Joel worked long shifts at the fire department and at his part-time jobs, and that he preferred to spend his leisure time hunting, rather than caring for Abbey. Christina submits that while Joel was working long hours and *343 spending his leisure time hunting, Abbey was being cared for by his mother, Kathy, and by Christina's grandparents.
¶ 14. Following Joel, Jr.'s birth, Christina began working four nights a week, from four p.m. to midnight, as a cocktail waitress at a casino. Christina testified that Kathy, not Joel, would often keep the children when she had to work, even though Joel did not. However, she added that Joel would usually go to his mother's house on these occasions. Because the testimony indicates that both Christina and Joel cared for the children while receiving assistance from family members, we can find no error in the chancellor's ruling that this factor did not favor either party.
Parenting Skills and Willingness and Capacity to Provide Primary Care
¶ 15. Focusing on Christina's past disregard of court orders which prohibited Hughes from having contact with the children, the chancellor found that this factor weighed in favor of Joel. The chancellor pointed out that Hughes, "a man 11 years older than Christina and twice divorced, has been accused by each of his ex-wives of child sexual molestation. He has also been accused of inflicting physical violence upon every woman he has been romantically involved with, including Christina." The chancellor also noted an instance where Christina demonstrated questionable parenting skills by instructing the children not to tell anyone that Joel, Jr. was injured, while riding on an all-terrain vehicle with Hughes and Hughes' son from a previous marriage, during a period when there was to be no contact between Hughes and the children.
¶ 16. In reaching his decision, the chancellor also relied on the report of the guardian ad litem:

Given all of the information at hand, this GAL concludes that substantial evidence supports a finding that sufficient risk exists to order restricted contact between Don Hughes and the children. While I believe the evidence is sufficient to prohibit contact, I do not have any reason to believe that such an order would be honored by Christina or her family. Therefore, it is the recommendation of this GAL that the Court restrict contact between Don and the children as follows: 1) the children shall never, under any circumstances, be left alone with Don Hughes; 2) Christina shall be prohibited from allowing Don Hughes to administer any form of punishment to or hitting the children in any way; 3) Don Hughes and Christina shall enter and complete an anger management course within six months; and 4) Don Hughes and Christina shall engage in and complete a course of counseling to address the issues raised by the prior psychological evaluations.
We find that there is substantial evidence supporting the chancellor's finding that this factor favors Joel.
Employment
¶ 17. The chancellor found this factor favored Joel. The chancellor noted that Joel had maintained stable employment, with the Biloxi Fire Department since the marriage, whereas Christina had worked sporadically, and had not maintained full-time or steady employment. Christina contends that this factor weighs in her favor because the chancellor criticized her for having several jobs, while ignoring Joel's job history. We find that the record indicates that Christina and Joel have each had several jobs; however, at the time of the hearing Joel was maintaining stable employment, while Christina was not.
¶ 18. In J.P.M. v. T.D.M., 932 So.2d 760, 775(¶ 45) (Miss.2006), the Mississippi *344 Supreme Court affirmed a chancellor's decision that this factor weighed in favor of the husband, who had maintained steady employment for over three years, stating, "[w]hile the evidence may not have shown that [the mother] was without any employment for months at a time, the testimony . . . does show that [the mother] held jobs sporadically, often on a seasonal basis only, and that she had gone through periods where she had no income at all." The court further stated that "[t]he chancellor heard this testimony and determined that Tom's work situation was more stable than that of Jane, who as of the date of the final hearing, had been in her current job less than three months." Id.
¶ 19. Christina, who was employed by Hughes at the time of the hearing, also contends that her work schedule is "far more conducive to parenting." She argues that Joel's duties as a fireman impede his ability to spend time with the children. Although Christina may have more time to spend with the children, this Court has affirmed a chancellor's determination that this factor favors a parent with a stable work history over a parent who works sporadically. In Beasley v. Scott, 900 So.2d 1217, 1220-21 (¶ 10) (Miss.Ct.App. 2005), this Court affirmed a chancellor's determination that this factor weighed in favor of a father who was employed by the same company for eleven years, even though he worked twelve-hour shifts for seven days during a fourteen-day period. We agree with the chancellor that Joel has a more stable employment history; thus, we cannot say that the chancellor's ruling is not supported by the record, simply because Christina's schedule is more flexible.
Age and Health of Parents
¶ 20. The chancellor found that this factor favored neither party, as both Joel and Christina were in good physical and mental health. We do not find any error in the chancellor's determination.
Emotional Ties of Parent and Children
¶ 21. The chancellor found that both parents have bonded with the children, and that the children have bonded with them; however, he concluded that this factor "slightly" favored Joel. It is apparent that the guardian ad litem's account of how the children reacted when they were told that their mother had arrived to pick them up carried considerable weight with the chancellor. In her forty-page report, the guardian ad litem related the incident as follows:
To confirm the children's reactions to Christina coming to get them, I asked John Mayfield (paternal grandfather) to say that Christina was coming to pick them up. John said, "Your mom is here to pick ya'll up." The children both looked around, almost in a panic. They both started crying and begging Kathy, "Can't we stay here with you." It was evident that the children did not want to go with their mother for some reason.
In addition, the guardian ad litem provided the following testimony at the hearing:
[GUARDIAN AD LITEM]: I had the first  the chance to firsthand observe the childrens' reaction when they thought their mother was coming to pick them up. And, judge, I'm going to tell you after dealing with children for a long time, I can't tell you the reason why, but it wasn't normal. It was  it was not normal.
THE COURT: What do you mean?
[GUARDIAN AD LITEM]: It was frightening. The little girl 
THE COURT: Tell me what you observed.
[GUARDIAN AD LITEM]: I asked the grandfather to please say, "I think your mom is coming. Here she *345 comes, ya'll get ready." And he did it in a very soft, subtle way. And I said, "Yeah," I said, "let's go get your stuff ready and I'll take you outside." They looked at each other and they looked around and said, "We don't want to go. Please don't make us go, we don't want to go." And a few seconds later they were clinging, crying. The little boy was hiding, did not want to go. "Please don't make me go. Please, I don't want to go. Please."
THE COURT: That's from the dad's to the mom's?
[GUARDIAN AD LITEM]: Yes. And I'm going to tell you that that is not normal. I'm not going to sit here and tell you or say, Christina that  what the reason for that is, but it's not normal. And given the other things that I've picked up along the way it's frightening to me.
¶ 22. In light of the report and testimony of the guardian ad litem, we find no error in the chancellor's determination.
Moral Fitness of Parents
¶ 23. The chancellor found that this factor favored Joel:
Christina admits that she has, and continues to engage in adulterous activity, refuses to abide by the Orders of the Court in that she has continued to have her children in the presence of Don Hughes, and has exhibited poor life choices. Christina has involved her children in her adulterous activity, having always told them of the situation up to, and including, the birth of her last child fathered by Don Hughes.
¶ 24. In Bower v. Bower, 758 So.2d 405, 408-09(¶ 8) (Miss.2000), the Mississippi Supreme Court affirmed a chancellor's decision awarding custody to a father when the mother ignored his orders. The chancellor held:
After the court entered its temporary order prohibiting Cindy from staying overnight with a man, she willing disobeyed the court's order by spending the night with Johnny Harris and this defiant act took place even though Cindy knew this court would view her contemptuous behavior unfavorably when the decision to award custody was made. This deliberate violation of a court order demonstrates her unwillingness to parent; choices to engage in illicit relationships . . . instead of spending time with her children clearly demonstrates her unwillingness to make the choice of her children over her hedonist inclinations. Id.

(emphasis added). There is no dispute that Christina wilfully violated the court's no-contact order between the children and Hughes.
¶ 25. Further, the Mississippi Supreme Court has clearly stated that, "despite the criminal nature of these acts, cohabitation is relevant only to the extent it can be shown to affect the child adversely." Id. at (¶ 30) (citing Cheek v. Ricker, 431 So.2d 1139, 1144 (Miss.1983)). Thus, Christina's cohabitation with Hughes is particularly relevant in light of the findings of the guardian ad litem. As previously stated, the record reflects that the chancellor issued a temporary order in response to the guardian ad litem's interim report. Apparently the chancellor agreed with the guardian ad litem that the children's contact with Hughes should be restricted and removed the children from Christina's primary care. Based on the evidence presented, we agree that substantial evidence exists to support the chancellor's determination, as Christina continued to allow the children to be in the presence of Hughes in clear violation of the chancellor's orders.
*346 ¶ 26. Christina also argues that it is inconceivable that Joel was not having sexual relations with his present girlfriend, Tally Walters, who he admits has stayed at his home overnight. It is Christina's contention that there is a double-standard concerning her relationship with Hughes and Joel's relationship with Walters. We note that Joel testified that the children were not present when Walters spent the night, and we have found nothing in the record which indicates that Joel violated any of the court's orders, unlike Christina who admits to doing so. Furthermore, the chancellor's statement that "Joel has a female companion, but there is no evidence that there has been cohabitation or any other inappropriate activity in the presence of the children" refutes Christina's argument that the chancellor applied a double standard. We find no error in the chancellor's determination.
Home, School, and Community Record of Children
¶ 27. The chancellor found that this factor favored Joel. After their separation, Christina left the marital home, and Joel has continued to reside there. Additionally, the marital home is the only home that the children have ever known, a home in which they presently reside with Joel. We agree with the chancellor that the children are too young to have established a community record. Therefore, we find no error in the chancellor's determination.
Preference of the Child
¶ 28. The chancellor found that this factor favored neither party, concluding that the children were not old enough to state a preference. Mississippi Code Annotated section 93-11-65(1)(a) (Supp.2006) provides in part:
[I]f the court shall find that both parties are fit and proper persons to have custody of the children, and that either party is able to adequately provide for the care and maintenance of the children, the chancellor may consider the preference of a child of twelve (12) years of age or older as to the parent with whom the child would prefer to live in determining what would be in the best interest and welfare of the child.
When the final judgment was entered Abbey was six years old, and Joel Jr. was four years old. Therefore, we find no error in the chancellor's determination that their age precluded them from stating a preference.
Stability of Home and Employment of Each Parent
¶ 29. The chancellor found this factor weighed in Joel's favor, because he had continuously lived in the marital home. The chancellor also took into consideration that Joel's home is very close to his parents' home. The chancellor pointed out that since Christina and Joel separated, she has lived in an apartment with her grandparents, a friend, and Hughes. On these facts, we find no error in the chancellor's determination. As previously stated, we agree with the chancellor that Joel's employment history is considerably more stable than Christina's. Thus, we cannot find that the chancellor's determination is not supported by substantial evidence.
Other Factors Relevant to the Parent-Child Relationship
¶ 30. The chancellor addressed several factors which support his decision to award Joel primary physical custody of the children: (1) Christina's disregard for the court's orders; (2) Christina's cohabitation with Hughes and her giving birth to his child out-of-wedlock; (3) Christina's refusal to acknowledge Hughes' past issues with domestic abuse toward his previous wives, children from previous marriages, *347 and Christina herself, and (4) the accusations of child molestation of one of his children and corporal punishment of Christina's children, resulting in bruises to the children.[2]
¶ 31. Christina argues that the chancellor placed too much emphasis on Hughes in granting custody to Joel. She cites several cases to support her contention that, in doing so, the chancellor committed reversible error. In her brief, Christina states, "[t]he appellate courts will reverse a chancellor when entirely too much emphasis [is placed] on one of the Albright factors. . . ." We agree that a chancellor should not give any one factor undue weight in making a custody determination; however, we do not find that the chancellor in this case committed such error. The chancellor was aware that Christina planned to marry Hughes when her divorce from Joel became final; thus, it is only logical to conclude that the children would spend a considerable amount of time around Hughes, had Christina been granted primary custody.
¶ 32. We also point out that the guardian ad litem concluded that Christina had chosen to ignore Hughes' pattern of domestic abuse. The guardian ad litem found that "Christina and her family has [sic] remained steadfast in their belief `in' Don Hughes and their denial of all the various allegations against him. Christina blows off her own encounter with Don's violent side by stating that she is a `drama queen.'"
¶ 33. When taking all of the Albright factors into consideration, we agree with the chancellor that it is in the best interest of the children to have their custody reposing with Joel, rather than with Christina. This issue has no merit, as we find nothing in the record which indicates that the chancellor failed to properly evaluate all of the Albright factors in making his determination.
2. Psychological Report
¶ 34. Christina next argues that the chancellor erred in allowing into evidence a psychological report which was conducted by Dr. Pam Cutrer during Hughes' divorce proceedings from his previous wife. On direct examination by Christina's attorney, Hughes testified that Dr. Cutrer prepared a summary report of his psychological evaluation.[3] On recross-examination, Joel's attorney requested that Hughes read a portion of the report, and Christina's attorney objected. Joel's attorney argued that the report had been brought up by Christina's attorney on direct and that the door had thus been opened. The court overruled the objection and allowed Joel's attorney to continue to cross-examine Hughes regarding specific passages in the report. After Joel's attorney had completed his recross-examination of Hughes, Christina's attorney had Hughes to read a passage from the report. However, later on in the proceeding, the court inquired as to whether Christina's attorney wanted the entire report admitted into evidence:
THE COURT: Do you want to put this psychological [report] into evidence?
[ATTORNEY FOR CHRISTINA]: That's fine.
[ATTORNEY FOR JOEL]: No, I absolutely don't object to it.
While Christina's attorney initially objected to admission of the report, the record reveals that she apparently abandoned *348 that position, because her subsequent assent to the admission of the report was not qualified. Therefore, we find no merit to this allegation of error.
3. Excited Utterance
¶ 35. Christina contends that the chancellor incorrectly admitted into evidence a hearsay statement made to Kathy by Joel Jr. The chancellor classified the statement as an excited utterance, an exception to the hearsay rule. M.R.E. 803(2). First, we note that this issue is waived, as Christina's attorney failed to make a contemporaneous objection. Christina's attorney did not object until after Kathy provided a complete account of what she alleged to have taken place:
Q. Have you ever said discouraging remarks 
A. Never.
Q.  about Mr. Mayfield or Mr. Hughes around these children?
A. Never. Never. The only thing I have said is I said, "Abby [sic] " because she would tell me  because the little man  we call [Joel Jr.] little man, he would wake up one night, he woke up screaming, and I said, "What's the matter, what's the matter?" And he said, "Mr. Don, Mr. Don." I said, "No, this is maw-maw. What's the matter?" And he said, "Mr. Don hit me." And I said, "What do you mean he hit you?" And he said, "He does like this to my head." So the next morning I said, "Abby [sic]," I said, "Did Mr. Don hit "
[ATTORNEY FOR CHRISTINA]: Your Honor, I'm going to object to the hearsay from the children.
¶ 36. In Smith v. State, 797 So.2d 854, 856(¶ 7) (Miss.2001) (citing Walker v. State, 671 So.2d 581, 597 (Miss.1995)), the Mississippi Supreme Court stated, "[w]e have repeatedly held that if no contemporaneous objection is made, the error, if any, is waived." "The rule governing the time of objection to evidence is that it must be made as soon as it appears that the evidence is objectionable, or as soon as it could reasonably have been known to the objecting party, unless some special reason makes a postponement desirable for him which is not unfair to the proponent of the evidence." Sumner v. State, 316 So.2d 926, 927 (Miss.1975) (citing Williams v. State, 171 Miss. 324, 157 So. 717 (1934)). Therefore, this issue is procedurally barred.
¶ 37. Procedural bar notwithstanding, we note that the chancellor erred in admitting Joel Jr.'s statements as excited utterances. An excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." M.R.E. 803(2). Because of the context in which this statement was made, this Court cannot accept that it qualifies as an excited utterance. Additionally, Joel Jr. made accusations against Hughes only after being questioned by Kathy. Therefore, we find that this is not an excited utterance as contemplated by Rule 803(2) and that the chancellor erred in admitting it. However, we find that this error was harmless, as there is more than an ample amount of properly-admitted evidence to support each of the findings made by the chancellor.
¶ 38. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Christina has since married Hughes, and they have a child that was born during the period that Christina and Joel were separated.
[2] Although accused, Hughes has not been convicted of domestic violence or child molestation.
[3] Hughes was called as an adverse witness by Joel's attorney and initially testified on cross-examination as an adverse witness.