# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01202-COA

LAUREN LEE                                                          APPELLANT

v.

BEAU BRAMLETT                                                       APPELLEE

DATE OF JUDGMENT:            08/08/2017
TRIAL JUDGE:                HON. M. RONALD DOLEAC
COURT FROM WHICH APPEALED:  LAMAR COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     WILLIAM C. WALTER
ATTORNEYS FOR APPELLEE:     ROBERT R. MARSHALL
                            KIMBERLY-JOY LOCKLEY MIRI
NATURE OF THE CASE:         CIVIL - CUSTODY
DISPOSITION:                AFFIRMED - 02/26/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Lauren Lee and Beau Bramlett are the natural parents of a minor child, Gregory,[1] born out of wedlock in 2010. For the first four years of the child's life, Lee and Gregory lived with Bramlett at his residence in Hattiesburg, Mississippi. Bramlett worked offshore for three-week intervals (twenty-one days on/twenty-one days off); Lee primarily stayed at home with Gregory but occasionally worked at a part-time job. In May 2015, the couple ended their relationship, and Lee filed a complaint to establish child custody, seeking child support and temporary and permanent legal and physical custody of Gregory. Acknowledging he was

---

[1] A fictitious name has been used for the minor child to protect his identity.

the child's natural father, Bramlett requested emergency custody.

¶2.    In a temporary order, the Lamar County Chancery Court adjudicated Bramlett as the natural father and ordered the parties to share physical custody of Gregory on a week-to-week basis.  Bramlett was ordered to pay Lee monthly child support of $1,000 and to provide medical insurance for the child.  On September 16, 2016, the chancery court appointed Stacey Sims as the guardian ad litem (GAL).  Kristin McGee was later substituted as the GAL.

¶3.    On June 10, 2017, Lee moved to Madison, Mississippi, with her fiancé, Matthew Pringle, and their newborn daughter so Pringle could start a new job.[2]  A few days later, Lee and Pringle were married.   Bramlett filed a petition for emergency relief requesting permanent physical custody of Gregory.  A trial was held June 29, 2017, and July 31, 2017.  Lee admitted Gregory had an extensive family-support system in Hattiesburg and was doing well in his school there.  But she argued that she should be given primary physical custody because she is a stay-at-home mother and that Gregory would do equally well in the Madison County School District.  Lee also noted Bramlett's work schedule as a reason she should have custody.  Bramlett, who has worked offshore in three-week intervals for fifteen years, testified that he earned a very good income at his job, enabling him to provide financially for all of Gregory's needs.  Bramlett also said he could not earn a comparable income if he changed jobs to be home more often.  His parents, who live nearby, testified they would take care of Gregory when Bramlett was away at work.  Bramlett also lived with his fiancée (now

_____

[2] Lee had been dating Pringle since she separated from Bramlett in May 2015.

2

wife) who could take care of Gregory.

¶4.    The chancery court entered its opinion and final judgment on August 8. Considering the *Albright*[3] factors in conjunction with the GAL's report, the court awarded primary physical custody to Bramlett and joint legal custody to both parties. Lee was granted visitation every other weekend. Lee appeals the chancery court's decision. Finding no manifest error in the court's ruling, we affirm.

## STANDARD OF REVIEW

¶5.    "This Court will only reverse a chancery court's decision 'if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard.'" *Mitchell v. Mitchell*, 180 So. 3d 810, 815 (¶6) (Miss. Ct. App. 2015) (quoting *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012)). We review questions of law de novo. *Id*. (citing *Irving v. Irving*, 67 So. 3d 776, 778 (¶11) (Miss. 2011)).

## DISCUSSION

### I.    Whether the chancery court erred in disregarding the natural parent presumption.

¶6.    A "bedrock principle of Mississippi family law" is the natural parent presumption, which gives preference to a child's natural parents, "even against those who have stood in their place, honor[ing] and protect[ing] the fundamental right of natural parents to rear their children." *Neely v. Welch*, 194 So. 3d 149, 155 (¶19) (Miss. Ct. App. 2015). It is not disputed that Bramlett is Gregory's natural parent. However, Lee argues that because Bramlett works offshore and must rely on his parents and his wife to care for the child during

---

[3] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

that time, the chancery court's ruling essentially constituted "a de facto award of custody and/or visitation rights to the grandparents over [Lee] who was expressly found to be a fit parent."

¶7.    Custody was awarded to Bramlett, Gregory's natural father. Bramlett's parents were not a party to this proceeding and have no custody rights under the order. The chancery court and GAL simply factored the paternal grandparents into the custody analysis because they volunteered to provide child care when Bramlett is working. There are no Mississippi cases on point with these facts, but we find instructive a holding by the South Carolina Court of Appeals. In *Brown v. Brown*, 606 S.E.2d 785, 791 (S.C. Ct. App. 2004), the court expressly rejected the principle of "de facto" custody where the father, who was awarded physical custody, worked long late-night shifts and lived with his parents. Similarly, in *Burns v. Burns*, No. COA10-50, 2011 WL 531473, **7-8 (N.C. Ct. App. Feb. 15, 2011), the North Carolina Court of Appeals found that although the minor children were often in the care of the paternal grandparents while in the father's custody, the grandparents had no rights under the trial court's order, "much less . . . any kind of 'de facto custody' of the minor children or any other legally enforceable rights."

¶8.    The dissent agrees with Lee, finding that she "should have been favored in a custody analysis to provide care instead of the paternal grandparents." Applying the dissent's reasoning, no parent who works offshore or out-of-town for extended periods of time would be granted custody without a finding that the other parent is unfit or has abandoned the child. We cannot adopt such a general rule as it disregards the chancery court's responsibility to

4

decide what is in the best interest of the child. Here, it is clear that custody was awarded to Bramlett, not his parents; therefore, the "natural parent presumption" applies equally to Lee and Bramlett. And, while the dissent is correct that Gregory lived with Lee for the first six years of his life, it fails to mention that Bramlett also lived in the home for the first four years of the child's life. The record further shows that both parties have extended family living in the Hattiesburg area; Lee's move to Madison uprooted Gregory not only from his father, but also from these close relatives. Bramlett's mother testified that before Bramlett and Lee split, she was Gregory's sole babysitter, stating:

> [Gregory] was at our house constantly. I was at [Gregory's] keeping him, and I kept [Gregory] even when [Lee] wasn't in school and – she would go do things, whatever. No, I kept – he stayed at our home. He has his own rooms at our home. He has everything he needs. He was there that often.

Bramlett's father also testified that Gregory had spent a lot of time at their home during the first four years of his life. Gregory will live with Bramlett for the three-week period when he is not working. The dissent fails to note that Lee will have visitation with Gregory two of the three weekends that Bramlett is gone for work and that Gregory will be in school during the week.

¶9. It is for the chancery court to take all of these factors into account in determining the best interest of the child; it has done so. We find no merit to this argument.

## II. Whether the chancery court erred in accepting the GAL's recommendations.

¶10. Although not obliged to follow the GAL's recommendations, the chancery court nevertheless found that her report was "supported by the preponderance of the credible

5

evidence presented at trial." Lee argues that the GAL only spent 5.8 hours working on the case before compiling her report and failed to comply with Mississippi's standards governing a GAL's investigation. Specifically, Lee says the GAL did not interview key witnesses, such as Bramlett's parents, or investigate her complaints regarding Bramlett's "anger issues and violent propensities."

¶11. "The requirements of a [GAL] are that [s]he be 'competent, without interests adverse to the child, and . . . adequately informed as to [her] duties.'" *R.L. v. G.F.*, 973 So. 2d 322, 325 (¶11) (Miss. Ct. App. 2008) (quoting *S.N.C. v. J.R.D.*, 755 So. 2d 1077, 1082 (¶16) (Miss. 2000)). The GAL's role "is to act as a representative of the court and to assist the court in protecting the interests of an incompetent person by investigating and making recommendations to the court." *Id*. In appointing the GAL, the chancery court instructed:

> Specifically, the [GAL] shall investigate all allegations in the pleadings concerning custody, visitation, support, and any and all other issues or concerns affecting the welfare and best interest of the minor child. . . . The [GAL] may interview the parties and witnesses and participate in discovery and pretrial preparations in this case as necessary for her investigation.

The Mississippi Supreme Court has held:

> In Mississippi jurisprudence, the role of a [GAL] historically has not been limited to a particular set of responsibilities. In some cases, a [GAL] is appointed as counsel for minor children or incompetents, in which case an attorney-client relationship exists and all the rights and responsibilities of such relationship arise. In others, a [GAL] may serve as an arm of the court—to investigate, find facts, and make an independent report to the court. The [GAL] may serve in a very limited purpose if the court finds such service necessary in the interest of justice. Furthermore, the [GAL's] role at trial may vary depending on the needs of the particular case. The guardian ad litem may, in some cases, participate in the trial by examining witnesses. In some cases, the [GAL] may be called to testify, and in others, the role may be more limited.

6

*S.G. v. D.C.*, 13 So. 3d 269, 280-81 (¶47) (Miss. 2009).

¶12.	We find that the GAL met the requirements set forth by the chancery court. She reviewed the pleadings, as well as Gregory's school records. McGee acknowledged at trial that she did not interview Bramlett's parents, but she explained: "Regarding the grandparents, there were no allegations that there was anything unfit about them. There were no allegations of abuse, neglect, that their home was unsafe, or anything to that matter." She interviewed Bramlett's new wife at the hearing and had no changes to her report or recommendation. The GAL's report also referred to Lee's claim that Bramlett had acted in a threatening manner toward her. McGee testified at trial:

> I met with the parties. I reviewed the municipal court records relating to the allegations of domestic abuse from [Bramlett] to [Lee]. That matter, from what I understand, is still pending before the municipal court. . . . But as far as that goes, I'm going to defer to what the outcome in the court is, and I can't really opine either way because I don't have that full information about that case file.

We find no merit to Lee's claim that the court erred in accepting the GAL's recommendations.[4]

### III.	Whether the chancery court erred in awarding custody to Bramlett.

¶13.	Lee disputes the chancery court's findings in awarding primary physical custody to Bramlett based on its analysis of the *Albright* factors and the recommendation by the GAL. We will address only those *Albright* factors at issue on appeal.

#### A.	Age, Health, and Sex of the Child

---

[4] As the dissent essentially reiterates Lee's arguments, we likewise disagree with its analysis on this issue.

¶14. The court found this factor to be neutral because Gregory, at age six, was "well past the age of tender years" and could be "equally cared for by persons other than the mother." *See Price v. McBeath*, 989 So. 2d 444, 454 (¶39) (Miss. Ct. App. 2008) ("[C]hildren who are at least four years old may not be subject to the tender years doctrine."). We find no error in the court's finding. Moreover, Lee simply reiterates her argument regarding the "natural parent presumption," which we have already found to be without merit.

### B. Parenting Skills

¶15. The chancery court found this factor favors Bramlett, noting Lee's recent move to Madison to be with her fiancé: "It would appear that [Lee's] recent move and transferring [Gregory] to another school was made for the sole purpose of moving closer to her fiancé, now husband, not what was best for her child."

¶16. Lee argues that her move was in the child's best interest and that the court ignored the fact that Bramlett spends weeks away from Gregory while working. She cites *Buntyn v. Smallwood*, 412 So. 2d 236, 237 (Miss. 1982), in which the Mississippi Supreme Court reversed a chancery court's denial of a mother's request for modification of custody. Similar to the present case, the father worked offshore, and the child was in the care of her stepmother and grandparents during that time. *Id*. The mother, who had previously relinquished custody, had since remarried, was living in "stable environment," and could be with the child every day. *Id*. at 237-38. Decided a year prior to *Albright*, *Buntyn* involved a female child of tender years (age three), and the supreme court held that "if the mother of a child of tender years—especially a female—is so fit, then she should have custody." *Id*.

8

at 238. Under *Albright*, "the age and sex of a child are merely factors to be considered," and "the tender[-]years doctrine has been gradually weakened in Mississippi jurisprudence to the point of now being only a presumption." *Lee v. Lee*, 798 So. 2d 1284, 1289 (¶17) (Miss. 2001). As previously noted, Gregory is not of tender years.

¶17. In *Hill v. Hill*, 942 So. 2d 207, 213 (¶23) (Miss. Ct. App. 2006), this Court found no error in a chancery court's determination that the father had better parenting skills because he "[made] his life decisions with [his child] as the number one priority at all times." Here, although Bramlett has to be away from the child periodically for his job, that job provides him with the opportunity to provide financial stability for his family. Lee testified that she had to move to Madison to be with Pringle because she needed his help in raising their newborn daughter. The chancery court reasoned that while it "appreciate[d] [Lee's] decision as to what is best for her, her new daughter, and her new husband[,] . . . the [c]ourt's paramount duty is to the best interests of [Gregory] in this case."

¶18. "No hard and fast rule can be applied to these most difficult of cases." *Buntyn*, 412 So. 2d at 238. Affording the chancery court our deferential standard of review, we cannot conclude that the court's finding was erroneous.

### C. *Willingness and Capacity to Provide Primary Child Care*

¶19. The chancery court determined this factor favored neither party since Lee had more time to care for Gregory but Bramlett had a solid family-support system and financial stability. Lee acknowledges that Gregory has a lot of family in the Hattiesburg area but argues that her intention to be a "stay-at-home mother" was the "best way to 'provide

primary child care.'"  Thus, she contends that the chancery court should have found the factor in her favor.  The dissent agrees, citing *O'Briant v O'Briant*, 99 So. 3d 802, 807 (¶20) (Miss. Ct. App. 2012), which affirmed a custody award to a stay-at-home mother over the child's natural father.  We find *O'Briant* distinguishable.  The child's father had a history of mental illness, for which he was receiving treatment; so the physical-and-mental-health-of-the-parent factor weighed in favor of the mother.  *Id*. at 807 (¶21).  Additionally, the child was under the age of four and had health issues stemming from his premature birth.  *Id*. at 804 (¶¶4-5).

¶20.    There is no dispute that Bramlett is gone for three-week intervals because of his employment, but, as noted, he has close family members—his parents and new wife—to help care for Gregory.  This Court has held:  "The presence of extended family is a legitimate factor to support awarding custody to a parent."  *Collins v. Collins*, 20 So. 3d 683, 690 (¶31) (Miss. Ct. App. 2008) (quoting *Messer v. Messer*, 850 So. 2d 161, 167 (¶18) (Miss. Ct. App. 2003)).  We note that in *O'Briant*, the stay-at-home mother relied on her family as well—she had moved in with her parents in Texas, who could help her with child care.  *O'Briant*, 99 So. 3d at 804 (¶4).

¶21.    Because of his employment, Bramlett has the financial resources to provide for Gregory's child care and school.  Although Lee is unemployed, she has more time to spend with Gregory.  We find no error in the court's finding that this factor did not favor either party.

> D.    *Moral Fitness of the Parents*

10

¶22. The chancery court determined that this factor favored neither party. Lee claims the court ignored her testimony that Bramlett had anger issues and that she was fearful of him. She also said that there were charges pending against Bramlett, referencing a domestic-abuse complaint she filed against Bramlett in March 2017. In that complaint, she alleged that Bramlett had acted in a threatening manner toward her at Gregory's soccer game while she was six months pregnant (with Pringle's child). The court did not ignore this testimony, noting in its order that both parties had testified to misconduct by the other party. The GAL's report also mentioned this incident, and the GAL, "out of an abundance of caution," asked Gregory if he had seen his parents angry. He simply told the GAL his parents had "fuss[ed] at each other" in the distant past, but he had never witnessed any physical abuse.

¶23. Both parties admitted they had engaged in sexual relationships with other persons outside of marriage, but as the chancery court observed: "A parent's cohabitation is not in itself a reason to deny custody unless the conduct is shown to have an adverse impact on the child." We find no error in the court's finding that neither party was favored as to this factor.

### E. Home, School, and Community Record of the Child

¶24. The chancery court found this factor favored Bramlett because the majority of Gregory's extended family lived in Hattiesburg, and he was excelling in his school there. Lee contends that this factor should have favored her as there was testimony Gregory had made new friends in Madison, "the Pringles' home is a nice, clean home in a good and safe neighborhood," and the new school he would attend was "excellent."

¶25. However, Lee and her new family had lived in Madison only a few weeks at the time

11

of trial. Both parties acknowledged that Gregory was a smart child and was doing well in his current school in Hattiesburg. Both Bramlett and Lee have family in the Hattiesburg area—Lee's mother was a property manager for an apartment complex in town, and her sister worked at the dentist's office where the child was a patient. We also note that Bramlett had enrolled Gregory in soccer and baseball leagues in the Hattiesburg area. Thus, we find the evidence supports the chancery court's finding.

### F. Stability of the Home Environment and Employment of Each Parent

¶26. Lee disputes the chancery court's finding that this factor favored Bramlett. The court observed that Bramlett had lived in his home since 2008; Lee has moved twice since splitting from Bramlett. It was also noted that Bramlett has been employed by the same company for five years. Although college-educated, Lee is unemployed and has not held a steady job. She acknowledged: "[Bramlett] pretty much supported me whenever I was with him the five years we were together."

¶27. "[T]his factor favors a parent with a stable work history over a parent who works sporadically." *Mayfield v. Mayfield*, 956 So. 2d 337, 344 (¶19) (Miss. Ct. App. 2007). In *Mayfield*, this Court found no error in chancery court's finding in favor of a father "who was employed by the same company for eleven years, even though he worked twelve-hour shifts for seven days during a fourteen-day period" over the mother who had a more flexible schedule. *Id*. We find no error in the court's determination that this factor favored Bramlett.

### G. Other Factors Relevant to the Parent-Child Relationship

¶28. The chancery court adopted the GAL's findings on this issue regarding Lee's lack of

employment and income and the "stability of [Bramlett's] home, the family support, and the close proximity to [Gregory's] school" in Hattiesburg. Lee argues on appeal that the evidence showed her husband, Pringle, had a salary of $70,000, which is "more than adequate to provide" for Gregory. As Bramlett notes, however, Pringle is under no legal obligation to support Gregory; so his salary is not relevant. Lee further speculates that had she been awarded custody, she would have received child support from Bramlett. We find it ironic that Lee argues Bramlett's income should be used as a basis to award her custody while also arguing that the manner in which he earns the income—offshore work—should be used as a factor against him. As discussed, we find no error in the chancery court's reliance on the GAL's report and recommendations, finding it was based on credible and competent evidence. This issue is without merit.

¶29. Accordingly, we find that the chancery court's findings were not manifestly erroneous and affirm the judgment.

¶30. **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, TINDELL AND McCARTY, JJ., CONCUR. LAWRENCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ. C. WILSON, J., NOT PARTICIPATING.**

**LAWRENCE, J., DISSENTING:**

¶31. The majority affirms the chancellor's award of primary physical custody to Bramlett despite the fact that Bramlett will be absent from the home three out of every six weeks. During that time, Gregory would live with Bramlett's parents and not Lee. I respectfully disagree.

13

¶32.    Gregory, the minor child, was six years old and had lived with his mother, Lee, his entire life. Lee and the child's father, Beau Bramlett, sought custody of Gregory. The chancellor recognized that "both parents have suitable housing for their child in their respective residential areas at this time" and that both Lee and Bramlett were suitable parents. Lee was a stay-at-home mother. Bramlett worked offshore in three week intervals. The chancellor awarded custody to Bramlett with the knowledge that he would be gone three out of every six weeks, and during that time Bramlett's parents would provide primary care instead of Lee, the natural mother. The record shows that Bramlett initially wanted to share physical custody with Lee until she moved to Madison, Mississippi, to live with her new husband and their newborn child.

¶33.    Mississippi law presumes that the best interest of the child is with the natural parent over a third party. *Nickle v. Burnett*, 122 Miss. 56, 65, 84 So. 138, 140 (1920). The Supreme Court has found that natural parents "have the natural right to the nurture, care and custody of their children." *E.J.M. v. A.J.M.*, 846 So. 2d 289, 294 (¶17) (Miss. Ct. App. 2003) (quoting *Simpson v. Rast*, 258 So. 2d 233, 236 (Miss. 1972)). This Court has specifically determined that the presumption is so strong that a third party can only be granted custody in situations where "the natural parent has relinquished his parental rights, . . . he has no meaningful relationship with his children, or . . . the parent's conduct is clearly detrimental to his children." *In re Brown*, 902 So. 2d 604, 607 (¶9) (Miss. Ct. App. 2004).

¶34.    None of the above scenarios are present in this case. Lee has never relinquished her rights to Gregory, and the record is silent as to any allegation or evidence of behavior that

14

would be detrimental to Gregory's health. It is also clear from the record that Lee has a meaningful relationship with the minor child. Lee testified at trial that she "stayed at home the first two and a half years of [Gregory's] life." The chancellor found that both parents were fit and able to provide care for Gregory. Because the presumption was never disproved or really addressed by the chancellor, Lee should have been favored in a custody analysis to provide care instead of the paternal grandparents. With the chancellor's ruling, Gregory will only have a natural parent around every three weeks even though his mother is a stay-at-home mom and perfectly capable of caring for him. The law presumes, and the facts support, that the child's best interest would be to live with his mother. Yet, the chancellor inexplicitly ruled that Gregory should effectively live with his grandparents every three weeks.

¶35. Furthermore, at the hearing, the guardian ad litem testified about the natural-parent presumption in the following exchange:

Q.    Okay. You're aware of the natural parent presumption –

A.    Yes.

. . . .

Q.    Okay [in] this case, the way this will play out is the grandparents will be caring for [the minor child].

A.    They would be assisting, yes.

Q.    When [Bramlett] is out of town for three weeks.

A.    Yes.

Whether assisting or not, the paternal grandparents are still guaranteed more visitation rights than the natural parent. Although the chancellor granted Lee "liberal visitation," if the

15

parties agreed, the chancellor only guaranteed visitation on alternating weekends of the month and holidays. Effectively, that arrangement means the grandparents would decide additional visitation for the capable and caring natural mother for the three weeks Bramlett is out of town.

¶36. This Court has held in the past that a stay-at-home parent is more able to provide care than a parent who relies on a third party to help with a child. In *O'Briant v. O'Briant*, 99 So. 3d 802, 807 (¶20) (Miss. Ct. App. 2012), this Court affirmed a custody award to a stay-at-home mother instead of the child's natural father. The father previously maintained custody of the child but was gone from the home to work or study quite frequently. *Id*. In his absence, the child's grandmother provided care. *Id*. The facts and findings of this Court in *O'Briant* are simply the reverse of the chancellor's conclusion in this case. Instead of following the ruling and logic of that case and the presumption within our jurisprudence as to a natural parent, the chancellor in this case essentially awarded shared custody between Bramlett and his parents, not Bramlett and the child's natural mother, Lee.

¶37. We are bound by the chancellor's decision where the opinion is "supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or an erroneous legal standard was applied." *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶53) (Miss. 2003). Here, the chancellor applied an erroneous legal standard when he failed to address or negate the natural-parent presumption. Further, he failed to determine if the presumption was neutralized by any of the above factors. In light of that standard, I would reverse on the issue of custody alone, but I also take issue with the chancellor's

16

reliance on the report of the guardian ad litem.

¶38.    The biggest concern with the report of the guardian ad litem is that she failed to explain why the natural-parent presumption should not control nor did she conduct an adequate investigation to render her opinion reliable.  The role of the guardian ad litem is to serve as an investigative arm of the court and make recommendations based on the best interest of the minor child.  While there is not a single exhaustive list of duties generally expected of a guardian ad litem, one would certainly expect the guardian ad litem to interview the parties, investigate the potential custodial living arrangements, and ensure that the court has the information necessary to make a decision that is in the best interest of the minor child.

¶39.    As the chancellor noted in his final judgment, the court is not bound to the recommendations of the guardian ad litem.  *Hensarling v. Hensarling*, 824 So. 2d 583, 587 (¶10) (Miss. 2002).  The recommendations and report of the guardian ad litem are mere tools for the court to receive additional information and aid the court in making the decision, which ultimately lies with the chancellor.  *S.N.C. v. J.R.D. Jr.*, 755 So. 2d 1077, 1082 (¶16) (Miss. 2000).  A guardian ad litem's report that fails to properly investigate the facts and circumstances of the child's best interest, however, should not be summarily accepted.

¶40.    Yet, here, the chancellor did just that.  For example, the guardian ad litem's report stated "[Lee] has now had two children out of wedlock by two different fathers."  The chancellor, apparently adopting word for word the guardian ad litem's report, wrote in his custody order "[Lee] has now had two children out of wedlock by two different fathers."  The

fact Lee has had two children (one of whom is the minor child in this case) out of wedlock is not a factor to be considered. The father has had a child (the minor child in this case) out of wedlock, but that fact appeared in neither the guardian ad litem's report nor the written order of the court. A chancellor must and should evaluate all of the facts and circumstances in a case to determine the best interest of the child, not simply take the report of a guardian ad litem and automatically insert its language (improper assertions included) into the order of custody.

¶41. Further, the guardian ad litem interviewed Lee, Bramlett, and Gregory. She spoke with Bramlett's fiancé briefly on the day of trial but had no communication with her before the day of trial. Before writing her report, her time sheet reflected that she spent only 5.8 hours on her entire investigation. At trial, she testified to a lack of any semblance of an investigation into the living arrangements she was recommending:

> Q. Did you not interview Greg Bramlett [Bramlett's father]?
>
> A. I did not.
>
> Q. Or Karen Bramlett [Bramlett's mother]?
>
> A. No.
>
> Q. Or any other close relatives.
>
> A. No. Regarding the grandparents, there were no allegations that there was anything unfit about them. There were no allegations of abuse, neglect, that their home was unsafe, or anything to that matter.
>
> Q. But you were aware that what the Bramletts [Gregory's grandparents] were proposing is for [Gregory] to stay with [them] three weeks – during the three weeks he is offshore?

A.      That – I did hear that.

Q.      Did you visit the Bramlett's home?

A.      No, I did not.

Q.      Did you visit [Bramlett's] home?

A.      No.

Q.      Did you visit the Pringles' [Lee's new married name] home in Madison?

A.      No.

¶42.    Moreover, the guardian ad litem testified that she had not spoken to any of Gregory's teachers or visited his school. It appears that the guardian ad litem was aware that Gregory's grandparents were to be primary caregivers for twenty-one days of every six weeks but did not investigate if the living arrangement was in the child's best interest.

¶43.    Accordingly, I find issue with the chancellor's reliance on the guardian ad litem's report and the chancellor's conclusion that the best interest of the child was some hybrid form of joint physical custody between the natural father and the paternal grandparents over that which the law presumes – the natural parent (in this case the natural mother). The chancellor bears a responsibility to decide matters of custody with the best interest of the child at the forefront, and the law of Mississippi presumes those interests are best with a natural parent unless proven otherwise. Therefore, I dissent.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**